Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2018 CO 5**

**No. 15SC448, People v. Griego—Attempted Recklessness—Attempted Reckless Manslaughter—Equal Protection**

This case presents the question of whether the requirement in the attempted reckless manslaughter and attempted second degree assault statutes that a defendant place "another person" at risk of death or serious bodily injury necessitates that an actual, discernible person be placed at risk, or if "another person" can refer to the public at large.  The supreme court concludes that the statutes at issue require a showing of a risk to an actual, discernible person and that a risk to the public at large is insufficient.

Because the People presented no evidence that the defendant's actions put any particular person at risk, the supreme court affirms the judgment of the court of appeals reversing Griego's convictions.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2018 CO 5

**Supreme Court Case No. 15SC448**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 10CA2609

**Petitioner:**

The People of the State of Colorado,

v.

**Respondent:**

Isidore Griego.

## Judgment Affirmed
*en banc*
January 22, 2018

**Attorneys for Petitioner**
Cynthia H. Coffman, Attorney General
Katharine Gillespie, Senior Assistant Attorney General
  *Denver, Colorado*

**Attorneys for Respondent:**
Douglas K. Wilson, Public Defender
Sarah A. Kellogg, Deputy Public Defender
  *Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE COATS** dissents, and **JUSTICE BOATRIGHT** joins the dissent.

¶1     Prosecutors charged respondent Isidore Griego with attempted reckless manslaughter and attempted second degree assault arising out of two incidents in which Griego drove drunk but due to traffic conditions at the time of the incidents did not ultimately put any particular persons at risk.  We now must decide whether the requirement in the attempted reckless manslaughter and attempted second degree assault statutes that a defendant place "another person" at risk of death or serious bodily injury necessitates that an actual, discernible person be placed at risk, or if "another person" can refer to the public at large.[1]  We conclude that the statutes at issue require a showing of a risk to an actual, discernible person and that a risk to the public at large is insufficient.  Holding otherwise would leave the statutes without a clear limiting principle and would raise equal protection concerns.  Accordingly, we hold that the court of appeals division below correctly determined that the evidence did not support Griego's convictions for attempted reckless manslaughter and attempted second degree assault.  See People v. Griego, 2015 COA 31, ___ P.3d ___.  We therefore affirm the division's judgment.

---

[1] Specifically, we granted certiorari to review the following issues:

1.  Whether the court of appeals erred when it ruled that a specific, identifiable individual had to be harmed for the defendant to be found guilty of attempted reckless manslaughter and attempted second degree assault.

2.  Whether the court of appeals erred when it ruled that the evidence was insufficient to convict the defendant of attempted reckless manslaughter and attempted second degree assault because there was some evidence to support the convictions.

## I. Facts and Procedural History

¶2     The charges in this case arose from Griego's December 26, 2005 and October 7, 2006 arrests for driving under the influence of alcohol ("DUI").

## A. December 26, 2005 Arrest

¶3     At 9:30 p.m. on December 26, 2005, while working in Arapahoe County, Officer Dan Hyde observed Griego driving southbound on South Platte Canyon Road with no lights on. Officer Hyde got behind Griego and activated his police lights.

¶4     As Officer Hyde followed, Griego turned his headlights on and off three or four times and swerved to the left, about halfway over the center line, before swerving back and traveling all the way across the shoulder line. Officer Hyde thought Griego would stop at that point, but he did not. Rather, he again began to drift to the left. Seeing a vehicle then approaching Griego in the northbound lane, Officer Hyde activated his siren to warn the oncoming driver, and that driver pulled over. As a result, the oncoming driver never drew closer than 100 to 150 feet from Griego's vehicle.[2]

¶5     Griego then drifted back to the right side of the road, crossed the southbound lane, and ultimately drove into a ditch next to the road. Once in the ditch, he continued to drive for about a block, hitting a street sign and pulling it out of the ground along the way. He then drove back onto the southbound lane and approached an intersection. Although the traffic light was red, Griego did not slow down or stop. Instead, he

---

[2] The record contains conflicting evidence as to the exact distance between Griego's car and the approaching car, with Officer Hyde alternatively reporting a distance of 100 to 150 feet and 100 to 150 yards. For purposes of this opinion, this distinction is not material.

continued through the light and turned left. After driving for another block and a half, he turned right into an apartment complex parking lot, where he ultimately hit a curb and came to a stop.

¶6     Officer Hyde then got out of his car and approached Griego's vehicle. When he got there, he smelled a very strong odor of alcohol and noted that Griego's speech was so slurred that the officer could barely understand what Griego was saying. Officer Hyde arrested Griego and gave him a summons for DUI.

¶7     Notably, Officer Hyde was of the view that Griego's vehicle "was never an imminent danger to the oncoming northbound car" and that "Griego's weave into the center lane area did not jeopardize or threaten any oncoming traffic." As a result, the officer did not issue a summons for reckless driving.

## B. October 7, 2006 Arrest

¶8     Ten months later, at 2:45 a.m. on October 7, 2006, Officer John Jones responded to a report that a person was asleep behind the wheel of a vehicle that was parked at an intersection in Arapahoe County. When Officer Jones approached the car, he found Griego asleep at the wheel with his foot on the brake, the engine running, and the car in drive. No other cars and no pedestrians were in the vicinity of Griego's vehicle at that time.

¶9     Officer Jones tried to get Griego's attention by pounding on the window and yelling at Griego to wake up. After five minutes of such pounding and yelling, Griego woke up and rolled down the car window. When he did, Officer Jones noted an odor of

alcohol coming from Griego's breath, and the officer arrested Griego and gave him a summons for DUI.

### C. Investigation by District Attorney's Office

¶10 While both of the foregoing cases were pending, someone in the District Attorney's office contacted Thomas Malone, a senior investigator in that office, and asked him to investigate the two incidents for additional charges "outside the realm of a DUI case." This request was apparently motivated by the fact that Griego had a large number of prior DUI arrests.

¶11 Investigator Malone conducted what he described as a "comprehensive" investigation into both of the pending cases against Griego. During this investigation, Investigator Malone met with Officer Hyde, and the two visited the scene of the December 26, 2005 incident, where Officer Hyde explained what he had observed that night. In the course of this discussion, Investigator Malone specifically asked Officer Hyde why he did not charge Griego with reckless driving. Officer Hyde responded that Griego's conduct did not pose an imminent threat to the other vehicle that had approached and did not jeopardize or threaten any other oncoming traffic.

¶12 Investigator Malone also reviewed the reports from Griego's October 7, 2006 arrest. He did not speak with Officer Jones about that incident, however, because he did not feel that an interview would shed any further light on what had occurred.

¶13 Thereafter, Investigator Malone prepared a lengthy written report for the District Attorney's office. In this report, he stated that he "personally did not believe it to be appropriate" to file any charges beyond the DUI offenses charged by the officers.

## D. Charges and Trial

¶14    Notwithstanding the decisions made by the officers on scene and the conclusions reached by Investigator Malone concurring in the officers' judgments, the District Attorney decided to charge Griego with attempted reckless manslaughter and attempted second degree assault, both class five felonies, but not with DUI.  Thus, in the complaint and information, the People alleged that Griego had (1) "recklessly attempted to cause the death of <u>any and all members of the public in his vicinity</u>" and (2) "recklessly attempted to cause serious bodily injury to <u>any and all members of the public in his vicinity</u>, by means of a deadly weapon, namely: a motor vehicle." (Emphases added).

¶15    Prior to trial, Griego moved to dismiss the foregoing charges.  He contended that the People could not establish the requisite elements of the charged crimes (and particularly the requirement of a substantial step toward commission of the offense) because (1) the complaint and information did not properly specify any individual who was an alleged victim and (2) no statements in discovery suggested that Griego had used his vehicle as a weapon.  The trial court denied Griego's motion.

¶16    The case proceeded to trial, and at trial, the People presented evidence pursuant to CRE 404(b) that between September 29, 1991 and September 30, 2001, Griego had been arrested and cited for DUI seven times.  The court instructed the jurors that they were only to consider these prior acts for a limited purpose, namely, to "determine whether the defendant was aware of the risk created by the charged acts or conduct."

¶17    At both the end of the People's case and the close of all of the evidence, Griego moved for a judgment of acquittal. The court denied both motions, and the jury ultimately convicted Griego on all counts. Thereafter, the trial court sentenced Griego to four years in the Department of Corrections for attempted manslaughter and two years for attempted second degree assault, to be served concurrently.

## E. Griego's Appeal

¶18    Griego appealed, arguing, as pertinent here, that the People had not shown that "another person" had actually been put at risk by Griego's behavior. Griego contended that absent such a showing, the evidence was legally insufficient and his convictions could not stand.

¶19    The People responded that for purposes of the attempt crimes at issue, they did not need to specify an individual who was put at risk. Rather, they needed to show only that Griego had the requisite intent to complete the crimes and that he took substantial steps toward harming or killing someone in the greater public.

¶20    In a split, published decision, a division of the court of appeals concluded that "another person" was not superfluous statutory language and that this element was not satisfied by an allegation that the victims were "any and all members of the public in [a defendant's vicinity]." Griego, ¶ 34, ___ P.3d at ___. Rather, to secure a conviction under the statutes at issue, the People were required to establish that Griego had placed "another person" (i.e., a "discernible person") at substantial risk of likely death or serious bodily injury. Id. at ¶ 42, ___ P.3d at ___. Perceiving no such proof, the division

7

reversed the judgment of conviction and remanded the case for entry of a judgment of acquittal on all counts. <u>Id.</u> at ¶¶ 44, 46, 48, ___ P.3d at ___.

¶21 Judge Booras dissented. In her view, the People introduced sufficient evidence to establish that Griego had placed another person in danger of death or serious bodily injury. <u>Id.</u> at ¶ 49, ___ P.3d at ___ (Booras, J., dissenting). In support of this conclusion, Judge Booras relied on the evidence that another vehicle was approaching from the opposite direction and that it had to pull over to the side of the road when Griego weaved across the center line. <u>Id.</u> at ¶¶ 53–54, ___ P.3d at ___. Because Judge Booras concluded that Griego had placed at least one person at risk, she did not need to decide whether actions that threaten the general public, rather than a particular individual, could be sufficient to establish that "another person" was put in danger. <u>Id.</u> at ¶ 53, ___ P.3d at ___.

¶22 The People petitioned this court for certiorari review, and we granted that petition.

## II. Analysis

¶23 We begin by noting the applicable standard of review. We then address the meaning of the term "another person" in the attempted reckless manslaughter and attempted second degree assault statutes. After concluding that the term "another person" in those statutes requires a showing that the defendant's actions placed a discernible person at risk of death or serious bodily injury, we turn to whether the People presented sufficient evidence to meet that requirement here.

## A. Standard of Review

¶24    When assessing the sufficiency of the evidence supporting a conviction, we review the record de novo to determine whether the evidence, viewed in the light most favorable to the prosecution, was both substantial and sufficient to support the conclusion by a reasonable mind that the defendant was guilty beyond a reasonable doubt. See People v. Perez, 2016 CO 12, ¶ 8, 367 P.3d 695, 697.

¶25    Likewise, we review questions of law involving statutory interpretation de novo. People v. Gallegos, 2013 CO 45, ¶ 7, 307 P.3d 1096, 1099.  In construing a statute, we interpret the plain language of the statute to give full effect to the intent of the General Assembly.  Id.  When the statutory language is clear, we apply the plain and ordinary meaning of the provision.  Id.  In doing so, we give consistent, harmonious, and sensible effect to each part of the statute, and we interpret every word, rendering no words or phrases superfluous and construing undefined words and phrases according to their common usage.  Id.

## B. Elements of the Charged Offenses

¶26    "A person commits the crime of manslaughter if . . . [s]uch person recklessly causes the death of another person." § 18-3-104(1)(a), C.R.S. (2017) (emphasis added). "A person commits the crime of assault in the second degree if . . . [h]e recklessly causes serious bodily injury to another person by means of a deadly weapon." § 18-3-203(1)(d), C.R.S. (2017) (emphasis added).  A person acts recklessly "when he consciously disregards a substantial and unjustifiable risk that a result will occur or that a circumstance exists."  § 18-1-501(8), C.R.S. (2017).

¶27 The inchoate offense of criminal attempt is established when a person, "acting with the kind of culpability otherwise required for commission of an offense, . . . engages in conduct constituting a substantial step toward the commission of the offense." § 18-2-101, C.R.S. (2017). "A substantial step is any conduct, whether act, omission, or possession, which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." Id.

¶28 Accordingly, to establish the crimes of attempted reckless manslaughter and attempted second degree assault, the People must prove, as pertinent here, that with the kind of culpability required to commit these crimes, the defendant engaged in conduct constituting a substantial step toward causing an unjustifiable risk of death or serious bodily injury to "another person." §§ 18-1-501(8), 18-3-104(1)(a), 18-3-203(1)(d). The People contend that this requirement can be satisfied by a person's driving drunk on a public road and that therefore, when charging a person with attempted reckless manslaughter or attempted second degree assault, the People do not need to name an "identifiable person" who was placed at risk. For several reasons, we disagree.

¶29 First, the plain language of the reckless manslaughter and second degree assault statutes expressly contemplates death or injury to "another person." In People v. Thomas, 729 P.2d 972, 973 (Colo. 1986), we recognized the offense of attempted reckless manslaughter, but we were careful to note that such an offense is cognizable only when the act or conduct has proceeded far enough to be strongly corroborative of the firmness of the actor's purpose to complete those acts that would produce a substantial and unjustifiable risk of another's death. Id. at 975. Nothing in Thomas eliminated the

10

requirement that for either a completed or attempted crime of reckless manslaughter or second degree assault, "another person" must be victimized. To hold otherwise would effectively read the phrase "another person" out of the pertinent statutes, which we may not do. See Gallegos, ¶ 7, 307 P.3d at 1099.

¶30 Second, the People cite no case in which a court has upheld a conviction for attempted reckless manslaughter or attempted second degree assault when the case involved a risk to the public at large, rather than to a discernible victim. Indeed, each of the cases on which the People rely supports our conclusion that a conviction of either of the crimes at issue requires a discernible victim. Both Thomas and People v. Krovarz, 697 P.2d 378 (Colo. 1985), involved victims who were harmed or threatened by the defendant's actions. See Thomas, 729 P.2d at 973 (the defendant shot at and actually wounded the fleeing victim); Krovarz, 697 P.2d at 379 (the defendant was charged with attempted aggravated robbery after he held a putty knife to the throat of a store cashier before another customer wrested the knife from him and then detained him until store security guards arrived). Similarly, the other cases on which the People rely concerned completed crimes involving discernible victims. See People v. Hall, 999 P.2d 207, 210 (Colo. 2000) (a ski racer was charged with reckless manslaughter after a fatal collision with another skier); People v. Deskins, 927 P.2d 368, 369 (Colo. 1996) (the defendant was charged with multiple counts of vehicular homicide and child abuse after colliding with another car while driving under the influence of alcohol); People v. Jefferson, 748 P.2d 1223, 1224 (Colo. 1988) (the defendant was charged with two counts of murder after deliberation); Patton v. People, 168 P.2d 266, 269 (Colo. 1946) (the defendant was

11

charged with causing the death of another by operating an automobile in a reckless, negligent, and careless manner and with a wanton and reckless disregard for human life). As a result, we believe that these cases support our conclusion that the statutes at issue require that a discernible victim be placed at risk of death or serious bodily injury.

¶31 In this regard, the offenses of reckless manslaughter and second degree assault, which are defined as "crimes against the person," are distinct from (1) crimes defined as "offenses against public peace, order, and decency," such as vehicular eluding, § 18-9-116.5, C.R.S. (2017); and (2) traffic offenses, which have the purpose of protecting the public by regulating traffic on Colorado roads, see Daniels v. People, 411 P.2d 316, 318 (Colo. 1966) ("It should be observed that offenses such as careless driving, reckless driving and drunken driving were enacted for the purpose of regulating the movement of vehicular traffic on our streets and highways" and unlike reckless manslaughter, "are not concerned with the consequences flowing from [the conduct at issue]."); Frazier v. People, 90 P.3d 807, 812 (Colo. 2004) (noting that "the traffic code and the criminal code are directed at different societal harms"); People v. Fury, 872 P.2d 1280, 1283 (Colo. App. 1993) ("The clear intent behind the vehicular eluding statute is to protect members of the public from the dangers created by a driver attempting to elude a police officer. Therefore, we conclude that the prosecution is not required to specify one particular victim; any member of the public at large could be a victim.").

¶32 Reckless manslaughter and second degree assault are crimes against the person that require that a discernible victim be put at risk. Crimes against the public peace and traffic offenses, in contrast, generally do not.

12

¶33 Third, under the People's construction of the applicable statutes, every DUI and innumerable other driving offenses, which are ordinarily misdemeanors, could be charged as attempted reckless manslaughter or attempted second degree assault. We see nothing in the language of the pertinent statutes that would support such a conclusion, and we believe that such a construction could lead to absurd results, an outcome that we must avoid. See Frazier, 90 P.3d at 811 ("A statutory interpretation leading to an illogical or absurd result will not be followed.").

¶34 For example, under the People's view, reckless or distracted driving or even speeding at a particularly high rate of speed, all ordinarily misdemeanor traffic offenses, could in virtually every case be charged as the class five felonies of attempted reckless manslaughter or attempted second degree assault. In addition to the absurdity of such a result, such an outcome could also implicate equal protection concerns.

¶35 Equal protection of the laws assures that those who are similarly situated will be afforded like treatment. People v. Mozee, 723 P.2d 117, 126 (Colo. 1986). When two criminal statutes prescribe different penalties for identical conduct, a defendant is denied equal protection under the laws if he is convicted under the harsher statute. Id. Similarly, when separate statutes prescribe different penalties for what ostensibly might be different acts but offer no intelligent standard for distinguishing between and among these acts, those statutes deny equal protection under the law. People v. Marcy, 628 P.2d 69, 75 (Colo. 1981).

¶36 In addition, although the General Assembly may prescribe more severe penalties for acts that it perceives to have graver social consequences, "[e]qual protection of the

13

laws requires that statutory classifications of crimes be based on differences that are real in fact and reasonably related to the general purposes of criminal legislation." Jefferson, 748 P.2d at 1226. Accordingly, to overcome a challenge under the equal protection clause, the statutory classification must turn on "reasonably intelligible standards of criminal culpability," and any definition of a crime must be "sufficiently coherent and discrete that a person of average intelligence can reasonably distinguish it from conduct proscribed by other offenses." Marcy, 628 P.2d at 80–81.

¶37 Here, were we to adopt the People's proposed statutory construction, the distinction between attempted reckless manslaughter and attempted second degree assault (both class five felonies), on the one hand, and a number of lesser offenses, on the other, would disappear.

¶38 For example, no coherent distinction would remain between the type of act that would qualify as reckless driving, a class two misdemeanor, and the offenses at issue here. See § 42-4-1401(1), C.R.S. (2017) (providing that a person commits the crime of reckless driving if he or she "drives a motor vehicle . . . in such a manner as to indicate either a wanton or a willful disregard for the safety of persons or property"); see also People v. Pena, 962 P.2d 285, 289 (Colo. App. 1997) (equating the mental state of a "wanton or a willful disregard" with recklessness). Thus, identical behavior, namely, driving recklessly, could result in a person's being charged with either reckless driving or attempted reckless manslaughter or attempted second degree assault, leading to dramatically different punishments.

14

¶39 Likewise, a person driving under the influence of alcohol or drugs, which the People suggest is inherently reckless, could result in a person's being charged with either driving under the influence (a misdemeanor for the first two offenses, see § 42-4-1301(1)(a), C.R.S. (2017)) or attempted reckless manslaughter or attempted second degree assault (class five felonies).

¶40 Such outcomes implicate equal protection concerns because a person of average intelligence would not be able to distinguish between the conduct proscribed by the greater and lesser offenses. See Marcy, 628 P.2d at 80.

¶41 Finally, in our view, the People's interpretation of the statutes at issue affords no readily discernible limiting principle. Indeed, without the requirement that an actual person be placed in danger, prosecutors would be permitted to charge attempted reckless manslaughter or attempted second degree assault for a broad array of arguably risky conduct, including, as noted above, speeding, running a red light, or distracted driving.

¶42 Justice Dubofsky raised similar concerns in her special concurrence in Thomas, 729 P.2d at 977 (Dubofsky, J., concurring). There, Justice Dubofsky stated that she believed that the facts then before her warranted a conclusion that the defendant's actions justified his conviction for attempted reckless manslaughter because he had come close enough to intending harm. Justice Dubofsky noted, however, a legal commentator's concern with charging a person with attempted murder, under the wide range of conduct encompassed within "reckless," without a resulting death. Id. In the commentator's view, extending criminal liability that far could result in felony

15

convictions for conduct such as driving very fast on the wrong side of the road while going around a curve. Id. Such conduct, Justice Dubofsky observed, "is not in fact harmful if there is no traffic coming in the opposite direction." Id. We agree and thus conclude that when no actual person is in danger, attempt convictions such as those at issue here cannot stand.

¶43 We are not persuaded otherwise by the People's assertion that Thomas requires only that the defendant intend to engage in reckless conduct generally, regardless of whether the conduct actually created a risk to another person. As the People suggest, Thomas states that attempted reckless manslaughter requires only that a defendant have the intent to engage in and complete the risk-producing act or conduct and that such act or conduct be commenced and be sufficiently pursued so as to constitute a substantial step toward commission of the offense. Thomas, 729 P.2d at 975. As noted above, however, Thomas did not read the phrase "another person" out of the statute. Moreover, Thomas made clear that the act or conduct must proceed far enough to be strongly corroborative of the firmness of the actor's purpose to complete "those acts that will produce a substantial and unjustifiable risk of death of another." Id. Accordingly, Thomas supports our conclusion that merely engaging in reckless conduct is not enough and that the conduct at issue must be such that a discernible person is placed at substantial risk.

¶44 For these reasons, we conclude that in order to prove either the offense of attempted reckless manslaughter or the offense of attempted second degree assault, the People must demonstrate that a defendant placed a discernible person in danger of the

16

pertinent harm. The question thus becomes whether the People presented sufficient evidence to meet this requirement. We turn next to that question.

## C. Application

¶45 The People argue that the risk of death or serious bodily injury can be to another person generally, including any member of the public at large who may be driving on the road at the same time as a defendant like Griego. As stated above, we disagree with this contention and conclude that under the pertinent statutes, a discernible person must be placed at risk. Accordingly, we must decide whether the evidence was substantial and sufficient, under the standards that we have articulated today, to support Griego's convictions for attempted reckless manslaughter and attempted second degree assault. Because the jury found that each of the two incidents at issue would independently warrant conviction, we review each in turn.

### 1. December 26, 2005 Arrest

¶46 With regard to Griego's December 26, 2005 arrest, the People point to a number of pieces of evidence to establish that Griego created a risk of death or serious bodily injury. Specifically, they note that (1) Griego drove without his headlights on and crossed over the center line of traffic on multiple occasions; (2) Officer Hyde felt the need to activate his siren to warn approaching drivers of the risk that Griego posed to them; (3) the oncoming traffic was required to move to the side of the road; (4) due to his extreme intoxication, Griego did not yield to the officer's lights or sirens but rather continued driving erratically for miles before finally crashing into a curb; and (5) Griego

was driving drunk at 9:30 p.m. when the likelihood of other drivers being on the road was high.

¶47 In making this argument, however, the People all but ignore the fact that their own witnesses testified, <u>without contradiction</u>, that Griego's driving did <u>not</u> jeopardize or threaten any oncoming traffic and was "never" an imminent danger to the oncoming northbound car, a conclusion amply supported by the other evidence at trial. For example, at the time Griego weaved halfway into the northbound lane, the oncoming traffic was at least 100–150 feet away from him. Moreover, once Griego passed the oncoming traffic that had pulled over, he either drove in his own lane or in the ditch adjacent to his lane and therefore posed no risk to a discernible individual.

¶48 Accordingly, we agree with the division's majority that the evidence was not sufficient to support Griego's convictions for either attempted reckless manslaughter or attempted second degree assault arising out of the December 26, 2005 incident.

## 2. October 7, 2006 Arrest

¶49 With regard to Griego's October 7, 2006 arrest, the People point to no evidence that any car or pedestrian was in the vicinity of Griego's vehicle. To the contrary, the People's witnesses testified, again without contradiction, that no other cars and no pedestrians were present. The People thus relied exclusively on their theory that Griego was a threat to the public at large. For the reasons set forth above, we agree with the division that such evidence is not substantial and sufficient to support a finding that Griego placed "another person" in danger of death or serious bodily injury in the course of the October 7, 2006 incident.

18

## III. Conclusion

¶50     For these reasons, we conclude that to obtain convictions for attempted reckless manslaughter and attempted second degree assault, the prosecution must establish, among other things, a risk to an actual, discernible person and that a risk to the public at large is insufficient.  Accordingly, although we in no way condone Griego's apparent pattern of driving while intoxicated,[3] we agree with the division below that the evidence here did not support Griego's convictions for attempted reckless manslaughter and attempted second degree assault.  We thus affirm the judgment of the court of appeals and remand this case to that court with instructions that that court remand the case to the district court for entry of a judgment of acquittal on all counts.

**JUSTICE COATS** dissents, and **JUSTICE BOATRIGHT** joins the dissent.

---

[3] We note that in 2015, the General Assembly made it a class 4 felony to be convicted of a fourth alcohol- or drug-related offense arising out of separate and distinct criminal episodes.  See § 42-4-1301(1)(a).

JUSTICE COATS, dissenting.

¶51    I do not concur in the majority's affirmance of the court of appeals' judgment below both because I consider its rationale for doing so unconvincing and because I believe the danger it envisions from not doing so to be illusory.  More importantly, I believe that the majority's rationale is not only irreconcilable with the theory of attempt liability adopted by the General Assembly for this jurisdiction almost a half century ago but is additionally mischievous, both by reviving a discredited and largely moribund equal protection theory once current in the jurisdiction and by unapologetically infringing on charging prerogatives constitutionally allocated to a different branch of government altogether.  I therefore respectfully dissent and briefly outline my concerns.

¶52    The majority finds there to have been insufficient evidence to reach a jury on the inchoate offenses of attempted reckless manslaughter and attempted reckless second degree assault, based on its understanding that their elements necessarily include proof of a substantial step toward causing an unjustifiable risk of death or serious bodily injury to another "discernible" person, as distinguished from simply "another person"; and that the testimony at trial failed to sufficiently evidence, as fate would have it, that a particular, "discernible" person actually wandered within range of the defendant's drunken and reckless driving, so as to find himself at an unjustifiable risk of losing life or limb.  In support of this conclusion, the majority offers three reasons: first, that the "plain language" of the underlying offenses requiring death or serious bodily to "another person" would effectively be read out of the respective elemental statutes if the inchoate offense of attempting to commit either of them did not mandate proof that

1

a particular, discernible person was victimized; second, that the People failed to cite any prior case in which a conviction for one of these offenses was had in the absence of some discernible person having been put at risk; and third, that a failure to require the victimization of a discernible person would permit "every DUI and innumerable other driving offenses" to be charged as attempted reckless manslaughter or attempted second degree assault, an eventuality the majority considers to be absurd and therefore to be avoided as a matter of statutory construction.

¶53 Taken in that order, the first reason could not more clearly expose the majority's failure to grasp the nature of attempt liability in this jurisdiction. We have previously explained, in great detail, that with the adoption of a general attempt statute in the 1972 Colorado Criminal Code, we abandoned any notion of criminal liability based on the proximity of the defendant's conduct to the successful completion of an underlying offense, in favor of a scheme assigning criminal liability on the basis of conduct by the defendant that is strongly corroborative of the firmness of his purpose to commit that crime. See People v. Lehnert, 163 P.3d 1111, 1113–14 (Colo. 2007). By the same token, however, we made clear more than thirty years ago, and have reemphasized many times since, that attempt liability is not limited to specific intent crimes because the purpose, or intent, at issue in attempt liability does not include any intent that a proscribed result occur. See People v. Thomas, 729 P.2d 972, 975–76 (Colo. 1986). Rather it requires only that, acting with the kind of culpability otherwise required for commission of the underlying offense, including acting recklessly, the actor engage in conduct constituting a substantial step toward performing acts which, if completed,

2

would constitute the underlying offense. Id. at 974 (explaining People v. Frysig, 628 P.2d 1004 (Colo. 1981)). With regard to the crime of attempted reckless manslaughter, in particular, we explained that the purpose of which the actor's conduct must be strongly corroborative is merely the purpose "to complete those acts that will produce a substantial and unjustifiable risk of death of another." Id. at 975.

¶54 Although the substantive offense of reckless manslaughter is defined in terms of causing the death of another person, and therefore a particular person must of course have been killed for the crime to be complete, it does not follow that a particular person must have been endangered, or have come close to being killed, for purposes of the inchoate offense of attempted reckless manslaughter. As we expressly held in Thomas, to incur attempt liability for reckless manslaughter the actor need only recklessly perform an act that is strongly corroborative of his purpose to complete those acts that will produce a substantial and unjustifiable risk of death. Id. By asserting that for attempt liability to attach, some "discernible" person must be victimized, the majority literally stands the reasoning of Thomas on its head and undermines the conceptual justification for attempt liability, especially for other than specific intent crimes, under which we have operated for more than a quarter century. Rather than conduct that actually endangers, or comes sufficiently close to killing or causing serious bodily injury to another person, Thomas makes clear that it is an act evidencing the firmness of the actor's purpose to engage in conduct that would constitute the commission of the crime if it were to result in the proscribed outcome upon which attempt liability rests. Id.

¶55 Although the majority suggests that today's holding does not amount to a departure from <u>Thomas</u>, in virtually the same breath it expressly relies on Justice Dubofsky's special concurrence in that case, in which she again advocated for the proximity, or index of dangerousness, theory she put forward in <u>People v. Krovarz</u>, 697 P.2d 378, 381 n.9 (Colo. 1985), which was squarely rejected by the <u>Thomas</u> majority. Criticizing the breadth of the majority's construction of the attempt statute, the special concurrence argued that attempt liability for reckless manslaughter should be limited to cases in which it can be shown that someone in particular was actually endangered. Ultimately, however, that position did not carry the day, with the majority of the court holding instead that attempt liability for reckless manslaughter is imposed in this jurisdiction simply for conduct strongly corroborative of the actor's purpose to engage in conduct that would constitute the commission of the crime if the proscribed result were to occur.

¶56 As for the majority's second reason, I consider no more required for its rebuttal than a clear articulation of the reason itself. Surely the failure to cite a prior decision of this court "on all fours" with a proposition advanced by a party—as distinguished from failing to rebut a prior decision of this court holding the opposite—can signify at most that the proposition has not yet been squarely addressed, but not that it in any way lacks logical force. Whether the proposition remains unaddressed because it is so clearly wrong as to never before have been advanced or because it is so clearly right as to never before have required a defense, or for some other reason altogether, cannot be determined from a mere absence of case authority directly on point.

¶57 The majority's third reason suggests reliance on a preference in statutory construction for avoiding constitutional doubt. Because I consider the unique Colorado equal protection doctrine upon which the majority relies to be highly questionable; the majority's articulation of it to be inaccurate; and any further extension of it to be undesirable, I will address what I consider the flaws in the majority's reasoning accordingly.

¶58 Initially, I find it unfortunate that the majority breathes new life into this state constitutional doctrine, which has long been roundly criticized and rejected by the United States Supreme Court as involving no more than a matter of prosecutorial discretion, see United States v. Batchelder, 442 U.S. 114 (1979) (Marshall, J., writing for a unanimous court), and has, in more recent years, been limited by this court practically out of existence, see Dean v. People, 2016 CO 14, ¶¶ 14–15, 366 P.3d 593, 597–98. Following Batchelder, those jurisdictions upon which we had relied to find that equal protection prohibited more severe punishment for the commission of one crime than was prescribed for the commission of another crime proscribing the identical conduct, all accepted the logical force of the Supreme Court's reasoning and retreated from their prior pronouncements on the subject. See Hart v. State, 702 P.2d 651, 659–663 (Alaska Ct. App. 1985); Sheriff, Clark Cty. v. Killman, 691 P.2d 434, 436 (Nev. 1984); City of Kalamath Falls v. Winters, 619 P.2d 217, 228–231 (Or. 1980); State v. Cissell, 378 N.W.2d 691, 695–700 (Wis. 1985). By contrast, without offering any meaningful difference between the language of our own and the applicable federal constitutional provision, or any considerations unique to this jurisdiction, cf. Curious Theater v. Colo. Dept. of Pub.

5

Health & Env't, 220 P.3d 544, 551 (Colo. 2009) (articulating more current thinking concerning the different interpretations of similar state and federal constitutional provisions), other than the fact that this court alone is the ultimate arbiter of the state constitution, this court, in the absence of an equal protection clause of our own, interpreted our due process clause to countenance this unique, non-federal equal protection doctrine. See People v. Estrada, 601 P.2d 619, 621 (Colo. 1979). No challenge on the basis of this doctrine, however, has succeeded in this court for more than a quarter century and, even then, such challenge has succeeded only with regard to clear legislative inadvertence in adopting or amending one statute in such a way as to make it coterminous with an existing statute mandating a different penalty. Smith v. People, 852 P.2d 420, 423 (Colo. 1993); People v. Mumaugh, 644 P.2d 299, 300–01 (Colo. 1982). Whether or not it is time to abandon the doctrine altogether, it seems clear that this court's unwillingness to find identical proscriptions (at least until today) has left it as merely a burden for the lower courts of the jurisdiction to entertain and reject when raised.

¶59    In any event, however, as strict as we have been in forcing legislative consistency in criminal proscriptions, we have never suggested that equal protection is violated by charging, convicting, and sentencing a defendant for a more serious offense merely because his same conduct is also proscribed by a less serious offense. Unless it can be shown that the legislature intended to limit liability for particular conduct, as with certain regulatory offenses, People v. Bagby, 734 P.2d 1059, 1061–62 (Colo. 1987), the decision to prosecute the same conduct under a general, rather than a more specific,

6

proscription has always remained simply a matter of prosecutorial discretion, People v. Czajkowski, 568 P.2d 23, 25–26 (Colo. 1977). Even in this jurisdiction, only if the elements of one offense are indistinguishable from the elements of another prescribing a lesser punishment is equal protection implicated.

¶60 The majority indicates that but for its imputation of a "discernible" victim requirement, attempted reckless manslaughter and attempted reckless second degree assault would be indistinguishable from DUI and a host of other misdemeanor driving offenses. However, none of these driving offenses implicates in any way a substantial risk of causing death or serious bodily injury. But for its discernible victim requirement, the majority would equate attempted reckless manslaughter with reckless driving, in particular; however, driving a motor vehicle with "a willful and wanton disregard for the safety of persons or property" is clearly not the same as taking a substantial step toward recklessly killing someone. Initially, I note that this court has never before found "a willful and wanton disregard" for purposes of driving misdemeanors, a concept borrowed from tort law and signifying a kind of extreme or aggravated negligence, to be indistinguishable from the criminal mens rea of recklessness, and doing so, as the majority conclusorily does in this case, I consider substantially problematic in itself. More importantly, however, reckless driving is committed by disregarding the safety of persons or property—not by disregarding a substantial risk of killing someone. Clearly, nothing in our jurisprudence prohibits more severe punishment for disregarding a risk of more serious injury.

¶61　The import of the majority rationale appears to be that there can be no risk of causing the death of another person without reference to a particular victim. But as a matter of law and logic, this is clearly not the case. With regard to the scenario of this case, out-of-control driving at a time and place the defendant knows to be heavily populated by pedestrians or other drivers could clearly be found to amount to the conscious disregard of a substantial and unjustifiable risk that by his out-of-control driving he will cause the death of a pedestrian or other driver. Whether or not a particular pedestrian or driver fortuitously comes within range of actually being hit does not alter the substantial and unjustifiable risk of which he was aware and which he consciously disregarded when he chose to drive drunk on heavily populated roads.

¶62　A number of factors are relevant to the question whether the defendant attempted to commit the crime of recklessly causing the death of another, but whether someone in particular came close to being run over by him is not one of them. Even the actual presence of a discernible person could add nothing concerning the defendant's awareness and disregard of a substantial and unjustifiable risk when he decided to drive drunk. And in this specific case, while there may be merit in questioning the sufficiency of the evidence proving the defendant's awareness of a substantial risk that he would encounter others in his path on the nights and in the locations in question, and would likely be unable to avoid hitting and killing them, or even the probativeness of the evidence informing the jury of his prior drunk driving convictions, nothing in our attempt statute justifies imputing a requirement that he endanger a discernible person.

¶63    Even if it were within our purview to add such a requirement to the statutes defining attempt liability for reckless manslaughter, I would therefore find it unnecessary to do so.  Instead, I fear that the lasting impact of today's holding will be merely to undermine the conceptual framework for attempt liability under which we have long operated and reopen a number of questions seemingly long laid to rest.

¶64    I therefore respectfully dissent.

I am authorized to state that JUSTICE BOATRIGHT joins in this dissent.