The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
April 2, 2026

**2026COA24**

**No. 24CA1951, *People v. Peters* — Constitutional Law — Article II — Reprieves and Pardons — Offenses Against the United States — Article VI — Supremacy Clause Immunity — First Amendment — Freedom of Speech**

A division of the court of appeals addresses, for the first time in a published Colorado appellate decision, two significant issues implicating the interplay of federal authority and state sovereignty in the federal republic established by the United States Constitution: (1) whether the President of the United States has the power to pardon an individual for state law offenses and (2) whether the doctrine of Supremacy Clause immunity protects an individual who is not a federal officer or federal agent from state prosecution for actions taken in service of the federal government. After resolving both issues against Peters, and addressing her other appellate contentions, the division affirms her convictions. But the

division reverses her sentence because it was based in part on improper consideration of her exercise of her right to free speech. The division remands the case to the trial court for resentencing.

Court of Appeals No. 24CA1951
Mesa County District Court No. 22CR371
Honorable Matthew D. Barrett, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Tina Marie Peters,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE TOW
Welling and Lipinsky, JJ., concur

Announced April 2, 2026

Philip J. Weiser, Attorney General, Lisa K. Michaels, Senior Assistant Attorney General, Nora Passamaneck, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

John Case P.C., John Case, Littleton, Colorado; McSweeney, Cynkar & Kachouroff, PLLC, Patrick M. McSweeney, Robert J. Cynkar, Woodbridge, Virginia; The Ticktin Law Group, Peter Ticktin, Deerfield Beach, Florida, for Defendant-Appellant

¶ 1     Defendant, Tina Marie Peters, appeals the judgment of conviction entered on a jury verdict finding her guilty of three counts of attempt to influence a public servant and one count each of conspiracy to commit criminal impersonation, first degree official misconduct, violation of duty, and failure to comply with requirements of the Secretary of State.  This appeal requires us to consider, for the first time in a published Colorado appellate decision, two significant issues implicating the interplay of federal authority and state sovereignty in the federal republic established by the United States Constitution: (1) whether the President of the United States has the power to pardon an individual for state law offenses and (2) whether the doctrine of Supremacy Clause immunity protects an individual who is not a federal officer or federal agent from state prosecution for actions allegedly taken in service of the federal government.  Because we answer both questions in the negative, we reject Peters's challenge to the Colorado courts' jurisdiction over this prosecution.

¶ 2     Further, after reviewing Peters's other appellate contentions, we affirm the judgment of conviction in part and reverse it in part. Specifically, we affirm Peters's convictions, but we reverse her

1

sentence because it was based in part on improper consideration of her exercise of her right to free speech. We remand the case to the trial court with directions for resentencing.

## I. Background

¶ 3 The following evidence admitted at trial could support the jury's verdict.

¶ 4 Beginning in the spring of 2021, the Office of the Colorado Secretary of State (SOS) began preparation for election management software (EMS) upgrades across Colorado, including in Mesa County. Mesa County, like all counties across Colorado, contracted with Dominion Voting Systems (Dominion) to provide this software.

¶ 5 The EMS is typically updated every other year through a process called the "trusted build." During Mesa County's 2021 trusted build (the Build),[1] SOS staff, along with Dominion personnel, uploaded an updated and certified version of the software to Mesa County's server. Prior digital election records had

---

[1] To clarify, throughout this opinion "trusted build" refers generically to the process as applicable to all counties, while "the Build" refers specifically to the process undertaken in Mesa County.

2

to be backed up before the Build, and Dominion provided instructions on how to do this.[2]

¶ 6    At Mesa County's behest, Dominion requested that the SOS allow members of the public to attend the Build. Jesse Romero, the manager of the SOS team responsible for, among other duties, ensuring that counties use voting systems in compliance with the law and conducting post-election audits, described this as an unusual request. He testified that, in his experience, the trusted build process had never been public. Romero denied the request, citing, among other reasons, security concerns.[3] In his response to Mesa County's request, Romero said that only required personnel from Dominion, the SOS, and Mesa County would be permitted to attend the Build. He also said that cameras in the room would document the Build and suggested that Mesa County allow the public to view the recorded video.

---

[2] In addition, the original paper ballots for each election are retained for twenty-five months. *See* § 1-7-802, C.R.S. 2025.
[3] Romero also noted that the number of people in the room would need to be limited as a result of restrictions in place at the time related to the ongoing COVID-19 pandemic.

¶ 7     About a month before the Build, Peters, who at the time was the Mesa County Clerk and Recorder, met in her office with her chief deputy clerk, Belinda Knisley, and nongovernmental individuals, including Dr. Douglas Frank and Sherronna Bishop. At various points, Peters called Mesa County elections staff into the meeting.  During the meeting, Dr. Frank gave a presentation about alleged 2020 election fraud.  A discussion about opening up voting machines ensued, and Dr. Frank and Sandra Brown (one of the managers in Peters's office) said that opening the machines would be illegal.  Peters invited Dr. Frank to attend the Build to perform an "audit."  Dr. Frank said he could send a team to conduct the audit.  At this point in the meeting, Peters asked her elections staff to leave.

¶ 8     Later, Bishop introduced Gerald Wood to Peters, and Peters asked Wood, who was not a state or Mesa County employee, if he could help with technical needs such as creating a backup of Mesa County's elections system.  Meanwhile, Peters told Mesa County elections staff that Wood was a new Mesa County employee — an administrative assistant — who needed to learn the system because he was going to help Brown.  This wasn't true.  Peters informed staff

that Wood would attend the Build instead of her front-office elections manager.

¶ 9    Romero emailed instructions for the trusted builds to every county, reiterating that only authorized SOS staff, county elections staff, and Dominion staff could attend. The email stated that no later than one week prior to each county's trusted build, that county needed to disclose which staff members would be present and confirm that they would adhere to the specified procedures. In the email, Romero advised that "[i]f, when we arrive onsite, or during the process there are others present (beyond Dominion and county elections staff that have been authorized, and the Clerk & Recorder) in the area where the [t]rusted [b]uild will take place, we will move on to the next county." Finally, Romero instructed the counties to "[b]ackup any election projects on your voting system to removeable media before our arrival." Brown testified that she made multiple backups of the elections server before the Build.

¶ 10    At Peters's request, Knisley asked Mesa County's human resources department to provide Wood with the same highly exclusive employee badge access to Mesa County's elections equipment that Brown had. Peters also directed Knisley to fill out a

5

new hire form for Wood and submit an information technology help desk ticket to get him computer system access. After Wood received his badge, computer login, and email account, Peters told him to give his badge to Knisley. He did so. Knisley testified that Peters intended to use the badge to bring Conan Hayes, an individual associated with Dr. Frank, into the Build. Hayes was not a state or Mesa County employee. David Underwood — the Mesa County employee who gave Wood access to the computer system — testified that he would not have provided Wood access had he known Peters had misrepresented Wood to be a Mesa County employee.

¶ 11 Based on Peters's representations, Brown informed Romero that Mesa County would adhere to the procedures outlined in his email. She also stated that, in addition to herself, Wood — whom she identified as a Mesa County administrative assistant — and Peters would attend the Build.

¶ 12 Notwithstanding Romero's suggestion that Peters address her transparency concerns by permitting the public to view the security camera footage, Peters directed Knisley to turn off the security cameras in the room where the Build was to take place a week before the Build and turn them back on after the Build was

complete.  Knisley followed this instruction.  Mesa County's practice was for the cameras to remain on at all times.

¶ 13     The day before the Build, Peters directed Brown to show Wood around.  But instead of Wood, Peters brought in Hayes, who used Wood's badge.  Posing as Wood, Hayes made a "forensic image" of the elections server.

¶ 14     The next day, Danny Casias, an SOS employee, performed the Build.  He first confirmed that Mesa County had backed up the prior election records.  Brown confirmed she had performed the backup.  Peters then arrived with Hayes, whom Peters introduced to Casias as Wood, and identified him as a Mesa County employee. Romero testified that had he known Wood was not a Mesa County employee but was present at the Build, he would have directed Casias to "pack up and leave," and the Build would not have occurred.  And Casias testified that he would not have performed the Build had he known an "unauthorized" person was present. Peters also secretly recorded a video of the Build on her cell phone.

¶ 15     After the Build was complete, Hayes downloaded another copy of the server, and Peters later shipped the copy to him.  According

7

to Brown, Peters also sent pictures she took during the Build to "some team that was analyzing it."

¶ 16 A couple of months later, SOS employees learned that screenshots of a video, including a screenshot of Mesa County's confidential Build passwords from 2021, were posted online, triggering an SOS investigation into Peters and her office.

¶ 17 Based on the results of the investigation, a grand jury was impaneled. The grand jury indicted Peters on three counts of attempt to influence a public servant (one count each for her representations to Romero, Underwood, and Casias); two counts of conspiracy to commit criminal impersonation; and one count each of criminal impersonation, identity theft, first degree official misconduct, violation of duty, and failure to comply with requirements of the Secretary of State. A Mesa County jury convicted her of seven of the ten charges: all three counts of attempt to influence a public servant and one count each of conspiracy to commit criminal impersonation, violation of duty, first degree official misconduct, and failure to comply with the requirements of the Secretary of State.

8

¶ 18    According to the indictment, the first four of these charges were felonies, while the last three were misdemeanors. The trial court sentenced Peters to six months in the Mesa County jail on the misdemeanors, followed by an aggregate sentence on the felonies of eight years and three months in the custody of the Department of Corrections.[4]

¶ 19    Peters appeals, contending that (1) she is immune from state prosecution on Supremacy Clause immunity grounds; (2) there was insufficient evidence to support several of the convictions; (3) the trial court erred by excluding certain evidence; (4) the trial court erred by disallowing certain affirmative defenses; (5) the indictment failed to give her adequate notice of the charges against her; (6) the prosecutor made comments that violated CRE 404(b); (7) the trial court erred by failing to hold a post-trial hearing on alleged improper juror conduct; (8) the prosecutor committed misconduct

---

[4] Specifically, the trial court imposed concurrent sentences of three and a half years on the convictions for attempt to influence a public servant involving the SOS employees (Romero and Casias), a consecutive sentence of three and a half years for the attempt to influence Mesa County employee Underwood, and a consecutive sentence of fifteen months on the conviction for conspiracy to commit criminal impersonation.

in rebuttal closing argument; (9) the charge and conviction for conspiracy to commit criminal impersonation were misstated and, as charged, reflect a misdemeanor offense rather than a felony; and (10) the trial court made various errors and violated her constitutional rights during sentencing.[5]

¶ 20 While this appeal was pending, President Donald J. Trump purported to pardon Peters for "those offenses she has or may have committed or taken part in related to election integrity and security during the period from January 1, 2020 through December 31, 2021." Donald J. Trump, Executive Grant of Clemency, U.S. Dep't of Just. (Dec. 5, 2025), https://perma.cc/N5BB-WGJ7.

¶ 21 Thereafter, Peters filed a motion "to determine whether this court has jurisdiction to adjudicate" this appeal, asserting two arguments — a claim that the President's pardon abrogates her state law offenses and a reiteration of her Supremacy Clause immunity argument. The parties filed supplemental briefs on this motion.

---

[5] To the extent Peters raises additional arguments in her reply brief, we do not address them. *See People v. Boles*, 280 P.3d 55, 61 n.4 (Colo. App. 2011) (declining to address an argument raised for the first time in a reply brief).

¶ 22    We first address the jurisdictional challenges and conclude

that (1) the President's pardon does not reach Peters's state offenses

and (2) Peters is not protected by Supremacy Clause immunity.  We

then address Peters's remaining appellate contentions in turn.

## II.    Peters's Jurisdictional Challenges

¶ 23    Because jurisdiction is a threshold issue, we address it first.

As noted, her jurisdictional challenges are twofold: that President

Trump's pardon divests Colorado courts of jurisdiction over her

prosecution and that she is protected by Supremacy Clause

immunity.

¶ 24    At the outset, we note that, notwithstanding the specific

language in her motion, Peters almost certainly does not actually

want us to conclude that *we* lack jurisdiction.  If we lack

jurisdiction, we must dismiss the appeal and can take no action

with respect to the underlying judgment of conviction.  The

conviction would, therefore, stand — at least until the trial court

could be asked to consider a postconviction motion.  *See People v.*

*Vargas-Reyes*, 2018 COA 181, ¶ 1 (dismissing appeal for lack of

jurisdiction).

¶ 25    We recognize that the doctrine of Supremacy Clause immunity implicates subject matter jurisdiction. *See In re Neagle*, 135 U.S. 1, 75 (1890); *Ohio v. Thomas*, 173 U.S. 276, 284 (1899); *Kentucky v. Long*, 837 F.2d 727, 744 (6th Cir. 1988); *New York v. Tanella*, 374 F.3d 141, 146 (2d Cir. 2004); *see also* Fed. R. Crim. P. 12(b) advisory committee's note to 1944 adoption (stating that "immunity" is a Rule 12(b) defense). And a challenge to subject matter jurisdiction may be raised at any time during the case, including on direct appeal. Crim. P. 12(b)(2); *United States v. Richardson*, 672 F. App'x 368, 369 (5th Cir. 2016); *see, e.g.*, *Tanella*, 374 F.3d at 147 (reviewing on appeal the denial of a motion to dismiss based on Supremacy Clause immunity grounds). But it is the *trial* court's jurisdiction that Peters is really challenging.

¶ 26    Furthermore, to the extent Peters is seeking immediate release, she is asking the wrong court. That relief sounds in habeas corpus, which this court lacks authority to grant in the first instance. *See* 28 U.S.C. § 2241(d) (requiring that an application for federal habeas corpus relief be filed "in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted

and sentenced [her]"); § 13-45-101(1), C.R.S. 2025 (providing that a request for state habeas relief may be filed in "the supreme or district courts"). Thus, to the extent Peters is requesting such relief, we cannot grant it.

¶ 27 Putting her requested relief aside, we turn to Peters's jurisdictional contentions that she has been pardoned and that she was immune from prosecution in the first place.

## A. The Pardon

¶ 28 The United States Constitution grants the President the "Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment." U.S. Const. art. II, § 2, cl. 1.

¶ 29 The crux of Peters's argument is that the phrase "Offences against the United States" includes an offense against any of the states in the union. We join what appears to us to be every other appellate court that has addressed the issue and reject such an expansive reading of the phrase. *See, e.g.*, *Hain v. Mullin*, 436 F.3d 1168, 1172 (10th Cir. 2006) ("[T]he President does not have the power acting under the United States Constitution to pardon defendants convicted in state courts . . . ."); *People v. Hill*, 839 P.2d

13

984, 1013 (Cal. 1992) ("The President does not have the power to pardon those persons, like defendant, who are convicted only of crimes under state law."), *overruled on other grounds by*, *Price v. Super. Ct.*, 25 P.3d 618 (Cal. 2001). (Peters cites no case — and our research has found none — that has held otherwise.)

### 1. Standard of Review

¶ 30 Whether a President's pardon requires dismissal of the case is a legal question, which we review de novo. *Cf. In re Abrams*, 689 A.2d 6, 9 (D.C. 1997); *Hirschberg v. Commodity Futures Trading Comm'n*, 414 F.3d 679, 682 (7th Cir. 2005).

### 2. Analysis

¶ 31 As an initial matter, the parties appear to agree that the phrase "Offences against the United States" is ambiguous. "A provision is ambiguous when it is reasonably susceptible of multiple interpretations." *Pub. Serv. Co. of Colo. v. Outdoor Design Landscaping LLC*, 2026 CO 6, ¶ 24. We agree with the parties that the phrase is ambiguous and thus turn to relevant textual, structural, and historical considerations to glean the provision's meaning. *Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012).

## a. Textual Interpretation

¶ 32     We begin where every effort to interpret law should begin: with the text. What did the Founders mean when they enshrined in the Constitution the President's power to pardon offenses "against the United States"?

¶ 33     Peters contends, without citation to any legal or historical authority, that "the United States" in this clause refers to the thirteen individual sovereign states that existed at the time the United States Constitution was ratified, as well as to the federal government. Specifically, Peters points to the use of plural pronouns to refer to the United States in the Constitution to contend that the term must be referring to the states, not the federal government, which would take a singular pronoun. We disagree.

¶ 34     The United States Constitution repeatedly refers to "the several States," "each State," "that State," and "any State," including in clauses that also refer separately to "the United States." *See, e.g.*, U.S. Const. art. III, § 2, cl. 1 (extending the judicial power to cases arising under "the Laws of the United States" and to "Controversies to which the United States shall be a

15

Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States"); U.S. Const. art. IV, § 3, cl. 2 ("[N]othing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State."); U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union . . . ."); U.S. Const. art. VI, cl. 3 ("[T]he Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution . . . .").

¶ 35     Notably, the same clause establishing the presidential pardon power also states, "The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of *the several States* . . . ." U.S. Const. art. II, § 2, cl. 1 (emphasis added). Had the Founders wanted to extend the presidential pardon power to state offenses, they could have used language identical or similar to "the several States" later in the sentence. But they did not. Instead, they used only "the United States," which must mean something different than "the several States." *See Wright v. United States*, 302 U.S. 583, 588 (1938) ("To disregard such a deliberate

16

choice of words and their natural meaning would be a departure from the first principle of constitutional interpretation. 'In expounding the Constitution of the United States . . . every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added.'" (quoting *Holmes v. Jennison*, 39 U.S. (14 Pet.) 540, 570-71 (1840))). Moreover, according to traditional interpretive canons, the use of certain language in one part of a provision and different language in another part generally indicates that different meanings were intended. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (quoting 2A Norman J. Singer, Statutes and Statutory Construction § 46:06, at 194 (6th rev. ed. 2000)). Thus, in using "the United States," the Founders were referring to the federal government — not the individual states.

¶ 36    Nor does the Founders' use of a plural pronoun with "the United States" mean that the phrase must have referred to a plural noun (in other words, the states). The Constitution refers to Congress, the Senate, and the House as plural throughout its text, even though they are singular nouns. *See, e.g.*, U.S. Const. art. I, § 7, cl. 2 ("[U]nless the Congress by their Adjournment prevent its

17

Return, in which Case it shall not be a Law."); U.S. Const. art. II, § 2, cl. 2 ("[T]he Congress may by Law vest the Appointment of such inferior Officers as they think proper . . . ."). And we reject Peters's contention — again unsupported by citation to any authority — that the term "the United States" began to be used as a reference to the federal government, instead of the states themselves, only after the Civil War. *See Stanley v. Schwalby*, 147 U.S. 508, 521 (1893) (Field, J., dissenting) (providing examples of how both before and since "the Civil War, the United States have always been designated in the plural"); *see also Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893) ("The United States are a sovereign and independent nation . . . ."). Thus, a textual interpretation of Article II, Section 2, Clause 1 of the United States Constitution does not support Peters's claim.

### b. Structural Context

¶ 37 An analysis of the very structure of our federalist system of dual sovereignty dictates a similar conclusion.

¶ 38 Notably, unlike England's government, the United States is a federal republic. *Gamble v. United States*, 587 U.S. 678, 689 (2019) ("The United States is a *federal* republic; it is not . . . a unitary state

18

like the United Kingdom."). "The Constitution limited but did not abolish the sovereign powers of the States, which retained 'a residuary and inviolable sovereignty.'" *Murphy v. Nat'l Collegiate Athletic Ass'n,* 584 U.S. 453, 470 (2018) (quoting The Federalist No. 39, at 245 (James Madison) (Clinton Rossiter ed., 1961)); *see also Heath v. Alabama,* 474 U.S. 82, 93 (1985) ("The Constitution leaves in the possession of each State 'certain exclusive and very important portions of sovereign power.'" (quoting The Federalist No. 9, at 55 (Alexander Hamilton) (Jacob Cooke ed., 1961)). "Thus, both the Federal Government and the States wield sovereign powers, and that is why our system of government is said to be one of 'dual sovereignty.'" *Murphy,* 584 U.S. at 470 (quoting *Gregory v. Ashcroft,* 501 U.S. 452, 457 (1991)); *see also Printz v. United States,* 521 U.S. 898, 918 (1997) ("It is incontestible that the Constitution established a system of 'dual sovereignty.'" (quoting *Gregory,* 501 U.S. at 457)). And the "administration of a discrete criminal justice system is among the basic sovereign prerogatives States retain." *Oregon v. Ice,* 555 U.S. 160, 168 (2009). Indeed, Peters does not dispute this.

19

¶ 39   Recently, the United States Supreme Court stated that, "[a]s originally understood, then, an 'offence' is defined by a law, and each law is defined by a sovereign.  So where there are two sovereigns, there are two laws, and two 'offences.'"  *Gamble*, 587 U.S. at 683 (upholding the dual sovereignty doctrine, which allows a state to prosecute a defendant under state law after the federal government has prosecuted him for the same conduct under federal law without violating the Constitution's ban on double jeopardy); *see also Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 62 (2016) ("[U]nder what is known as the dual-sovereignty doctrine, a single act gives rise to distinct offenses — and thus may subject a person to successive prosecutions — if it violates the laws of separate sovereigns.").  Thus, limiting offenses "against the United States" to include only federal offenses recognizes the individual states' sovereignty over their own criminal justice systems.

¶ 40   Indeed, in Colorado, "[t]he governor shall have power to grant reprieves, commutations and pardons after conviction, for all offenses except treason, and except in case of impeachment."  Colo. Const. art. IV, § 7; *see* §§ 16-17-102 to -103, C.R.S. 2025.

### c. Historical Considerations

¶ 41　Finally, we turn to historical considerations, looking to "settled and established practice." *Moore v. Harper*, 600 U.S. 1, 32 (2023) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)) (noting that such a practice has long been a source of authority in interpreting the Constitution).

¶ 42　"Historical accounts of the Constitutional Convention of 1787 reveal that the Founders engaged in very little discussion about the meaning or scope to be given to the President's pardoning authority." *Abrams*, 689 A.2d at 29 (Terry, J., dissenting); *see also Ex parte Grossman*, 267 U.S. 87, 112 (1925) (noting that "[t]here seems to have been no discussion over the substance of the clause" at the Constitutional Convention); *Ex parte Wells*, 59 U.S. (18 How.) 307, 311 (1855) ("In the convention which framed the constitution, no effort was made to define or change [the meaning of the word 'pardon'], although it was limited in cases of impeachment.").

¶ 43　Nevertheless, some of the earliest legislative action taken in our newly established republic — the Judiciary Act of 1789, ch. 20, 1 Stat. 73, enacted by the First Congress — makes clear that the phrase "offence against the United States" meant only violations of

21

federal criminal law.  *See Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) (observing that actions by the First Congress provide "contemporaneous and weighty evidence of the Constitution's meaning" (quoting *Bowsher v. Synar*, 478 U.S. 714, 723 (1986))).  That act provided that a person accused of any "offence against the United States" would "be arrested, and imprisoned or bailed, as the case may be, for trial before such court of the United States as by this act has cognizance of the offence."  Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91.  The same act also created the position of United States Attorney, who is charged with the duty to prosecute "crimes and offences, cognizable under the authority of the United States."  *Id.* § 35, 1 Stat. at 92.  Similarly, a year later, the First Congress created a number of federal crimes in an act entitled "An Act for the Punishment of certain Crimes against the United States."  Crimes Act of 1790, ch. 9, 1 Stat. 112.  Thus, when providing for the punishment for crimes or offenses "against the United States," the First Congress used the term to mean only the federal government.

¶ 44	Indeed, over one hundred years ago, the United States Supreme Court said,

> We have given the history of [Article II, Section 2, Clause 1 of the United States Constitution] to show that the words "for offenses against the United States" were inserted by a Committee on Style, presumably to make clear that the pardon of the President was to operate upon offenses against the United States as distinguished from offenses against the states.

*Ex parte Grossman*, 267 U.S. at 113. While this statement is dictum (because the case did not involve an alleged violation of state law), it nevertheless evinces the generally accepted historical understanding that the presidential pardon power does not extend to state offenses.

¶ 45 Finally, and perhaps most telling, we are unaware of — and can find no historical record of — any instance of a President pardoning someone for a state offense.

¶ 46 Peters contends otherwise, arguing — once again without any citation to legal or historical support — that President George Washington's July 10, 1795, pardon issued after the Whiskey Rebellion applied to people who committed "state crimes of arson and theft." But Peters is incorrect. The explicit terms of President Washington's pardon limited its reach to "all treasons, misprisions of treason, and other indictable offenses *against the United States*."

23

George Washington, Proclamation, *in* 1 James D. Richardson, *A Compilation of the Messages and Papers of the Presidents* 173 (1897) (emphasis added), *reprinted in* University of California, Santa Barbara: The American Presidency Project, https://perma.cc/L3R8-ZWQJ. President Washington's pardon does not specifically mention offenses against the State (or, rather, Commonwealth) of Pennsylvania, where the Whiskey Rebellion occurred.

¶ 47    In fact, as the People point out, on August 26, 1795, the then Governor of Pennsylvania issued a separate pardon for "all treasons, insurrections, arsons, riots and other offences inferior to riots . . . which may have been and are indictable offences against the said State of Pennsylvania" engaged in during the "Whiskey Insurrection." Thomas Mifflin, Proclamation, *in* 4 *Pennsylvania Archives, Fourth Series, Papers of the Governors 1785-1817*, at 335-37 (George Reed ed., 1900). Thus, contrary to Peters's unsupported assertion, the Whiskey Rebellion pardons bolster, rather than undercut, the view that presidential pardons are limited to federal offenses, and it is the sole prerogative of the individual state's chief executive to issue a pardon for state offenses.

24

### d. Peters's Additional Contentions

¶ 48    Peters's additional contentions are similarly unavailing.

¶ 49    She argues that because she *could* have been charged with a federal offense for violating state election law, *see* 52 U.S.C. § 20511, the presidential pardon reaches the state offenses with which she was charged and of which she was convicted. Her argument is a non sequitur. The State of Colorado did not — indeed, lacked any authority to — charge her with any federal offense. This fact itself highlights the nature of our system of dual sovereignty and dictates against the expansive reading of offenses "against the United States" Peters urges us to adopt. In short, there is no basis to conclude that the mere possibility of her being charged *by the federal government* with a *federal offense* transforms state crimes into offenses "against the United States."

¶ 50    Peters's reliance on *Ex parte Grossman* is also misplaced. In that case, the United States Supreme Court held that

> [n]othing in the ordinary meaning of the words "offenses against the United States" excludes criminal contempts. That which violates the dignity and authority of *federal courts* such as an intentional effort to defeat their decrees justifying punishment violates a law of the

25

> United States, and so must be an offense against the United States.

267 U.S. at 115 (emphasis added) (citation omitted). Thus, the case stands for the proposition that an offense "against the United States" is not limited to a violation of statutory law but also includes a contemptuous violation of an order of a *federal* court. Nothing in the United States Supreme Court's opinion suggests that the pardon power reaches violations of *state* law or of *state* court orders.

¶ 51 Nor does Peters cite any authority for her bald assertion that the presidential pardon power extends to protect a person who is "defending a federal interest." Again, we have found no instance where the presidential pardon power has been stretched in such a way as to invade an individual state's sovereignty. In any event, as we discuss more fully below, Peters was not acting pursuant to a federal duty.

¶ 52 In sum, the President's pardon has no impact on Peters's state law offenses. Accordingly, it cannot and does not deprive the Colorado state courts of jurisdiction.

## B. Supremacy Clause Immunity

¶ 53    Peters also contends that the United States Constitution's Supremacy Clause shields her from prosecution. This jurisdictional contention is simply a reiteration of her first substantive claim on appeal — that the trial court erred by denying her motion to dismiss because she is immune from state prosecution under the Supremacy Clause. We disagree with this contention.

### 1. Applicable Law

¶ 54    Federal officers have long been immune from state prosecutions for their reasonable and necessary actions in the discharge of their federal responsibilities. *See, e.g., Neagle*, 135 U.S. at 75 (holding that a deputy marshal was immune from state prosecution for murder when he killed a man he suspected was about to stab a United States Supreme Court Justice); *Thomas*, 173 U.S. at 284 (concluding that a state court did not have jurisdiction over criminal prosecution against a federal officer acting pursuant to a grant of federal authority). This immunity is rooted in the Supremacy Clause of the United States Constitution, which provides,

> This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. "[I]ts implication is that states may not impede or interfere with the actions of federal executive officials when they are carrying out federal laws." *Wyoming v. Livingston*, 443 F.3d 1211, 1217 (10th Cir. 2006). Supremacy Clause immunity, when properly invoked, provides an absolute immunity from prosecution in state courts. *See Neagle*, 135 U.S. at 75; *Long*, 837 F.2d at 752.

¶ 55    "[W]e resolve the federal question of absolute immunity based only on federal law." *Churchill v. Univ. of Colo.*, 2012 CO 54, ¶ 28 n.7. Notably, however, no published Colorado case addresses a defendant's claim of Supremacy Clause immunity from prosecution in state court. Indeed, the United States Supreme Court has not decided a Supremacy Clause immunity case since 1920. *See Johnson v. Maryland*, 254 U.S. 51 (1920). "Modern Supremacy

Clause immunity doctrine has thus largely been developed in the lower federal courts." *Livingston*, 443 F.3d at 1220.

¶ 56 We note that the procedure usually followed in these cases did not occur here. Typically, Supremacy Clause immunity cases arise when a state charges a federal official with a crime under state law, and the official removes the case to federal court under 28 U.S.C. § 1442(a) (the federal officer removal statute). *See, e.g.*, *Livingston*, 443 F.3d at 1226; *Long*, 837 F.2d at 731. The federal officer removal statute permits removal to federal district court of any civil action or criminal prosecution against any officer "of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). In those circumstances, the federal court then evaluates the allegations against the federal officer to determine whether the officer has Supremacy Clause immunity. If the federal court determines the individual does not have immunity, the court remands the matter back to the state court. *See, e.g.*, *Mesa v. California*, 489 U.S. 121, 123-24, 139 (1989) (affirming appellate court's order of mandamus requiring the federal district to remand

a criminal prosecution to the state court because the defendant was not entitled to Supremacy Clause immunity).

¶ 57     We are not told why Peters opted not to test her immunity claim by removing the prosecution to federal court — especially given that she now asserts the trial court lacked jurisdiction to resolve her immunity claim.  But notwithstanding that challenge to the trial court's jurisdiction, her decision not to ask the federal court to resolve the immunity claim does not deprive us — and did not deprive the trial court — of the jurisdiction to do so.  To the contrary, "[s]tate courts have long adjudicated . . . whether federal officers are entitled to Supremacy Clause immunity." *Georgia v. Meadows*, 88 F.4th 1331, 1343 (11th Cir. 2023).  And encompassed within that determination must lie the assessment of whether a person claiming Supremacy Clause immunity is actually a federal officer.

### 2.     Standard of Review

¶ 58     We note that the facts underlying Peters's claim of immunity do not appear to be disputed.  The People do not contest that she was the Mesa County Clerk and Recorder, and they appear to concede that Peters had a statutory duty to preserve records

involving federal elections under 52 U.S.C. § 20701. Thus, whether Peters enjoys immunity is a question of law. *See Wolf v. Brenneman*, 2024 COA 71, ¶ 21. Our review, therefore, is de novo. *See Edwards v. New Century Hospice, Inc.*, 2023 CO 49, ¶ 14.

¶ 59 "While we must follow the United States Supreme Court's interpretation of federal law, we are not bound by decisions of lower federal courts." *Monez v. Reinertson,* 140 P.3d 242, 245 (Colo. App. 2006). Instead, we look to such decisions for guidance and follow the analysis that we find persuasive. *Cmty. Hosp. v. Fail,* 969 P.2d 667, 672 (Colo. 1998) (citing *People v. Barber*, 799 P.2d 936, 939-40 (Colo. 1990)).

### 3. Federal Statutory Duty

¶ 60 "It is by now well settled that under *In re Neagle,* a two-part test determines whether or not a state court has jurisdiction to prosecute a federal agent for conduct facially violative of a state's criminal code." *Long*, 837 F.2d at 744. Under *Neagle*, a state court has no jurisdiction "if (1) the federal agent was performing an act which he was authorized to do by the law of the United States and (2) in performing that authorized act, the federal agent did no more

31

than what was necessary and proper for him to do." *Long*, 837 F.2d at 744 (citing *Neagle*, 135 U.S. at 75); *see Tanella*, 374 F.3d at 147.

¶ 61 But this test presupposes that the prosecuted individual is a federal officer or agent. Thus, as a threshold matter, we must decide whether Peters is an individual to whom Supremacy Clause immunity extends. Notably, Peters does not contend that she is a federal employee or federal agent. Rather, Peters asserts that Supremacy Clause immunity extends to any individual acting pursuant to a statutory duty imposed by federal law. We disagree as a matter of law.

¶ 62 The cases on which Peters relies in support of this contention are unavailing. In *Hunter v. Wood*, 209 U.S. 205, 210 (1908), the United States Supreme Court extended immunity to a railroad employee acting under direct federal court order. Peters does not contend that she was acting pursuant to a federal court order. And the lower federal court cases Peters cites — *Connecticut v. Marra*, 528 F. Supp. 381, 383-84 (D. Conn. 1981), and *Brown v. Nationsbank Corp.*, 188 F.3d 579, 589 (5th Cir. 1999) — extended immunity to persons acting as agents for federal officers. To the extent language in *Marra* could be read to extend immunity to

anyone acting "pursuant to federal law," we agree with the People that such a proposition is dictum. *Marra*, 528 F. Supp. at 385 (referencing *Ex parte Conway*, 48 F. 77 (C.C.D.S.C. 1891), which involved a construction foreman building a telegraph line under Congressional authorization). The remaining cases on which Peters relies concern federal employees or federal officer removal. *See Mesa*, 489 U.S. at 125; *Neagle*, 135 U.S. at 75-76, *Tennessee v. Davis*, 100 U.S. 257, 263 (1879); *Sowders v. Damron*, 457 F.2d 1182, 1186 (10th Cir. 1972); *Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977); *Colorado v. Nord*, 377 F. Supp. 2d 945, 949 (D. Colo. 2005).

¶ 63    Therefore, at most, Supremacy Clause immunity extends to federal officers, those acting as an agent for a federal officer, and those acting pursuant to a federal court order. Peters does not contend that she falls within any of these categories. Rather, she contends that she was acting pursuant to a duty imposed by federal statute — specifically, 52 U.S.C. § 20701, which, as relevant to this case, required her to "retain and preserve" election records for twenty-two months. But Peters cites no case, nor are we aware of any, in which Supremacy Clause immunity has been extended to a

33

state officer acting pursuant to a federal statute. There is simply no authority for extending immunity that far.

¶ 64    In other words, as a matter of law, Peters is not an individual who can claim Supremacy Clause immunity. Thus, we have (and the trial court had) jurisdiction over the prosecution, and the trial court did not err by denying her motion to dismiss the charges on Supremacy Clause immunity grounds.[6]

### III.    Sufficiency of the Evidence

¶ 65    Peters next contends that there was insufficient evidence to convict her of attempt to influence a public servant, conspiracy to commit criminal impersonation, and first degree official misconduct. We disagree.

### A.    Standard of Review

¶ 66    "[W]e review the record de novo to determine whether the evidence before the jury was sufficient both in quantity and quality to sustain the convictions." *Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005). We view the evidence as a whole and in the light most

---

[6] Even if a federal statute could impose a duty on Peters that would endow her with immunity, as discussed below, she was not acting pursuant to any such duty, and thus we would reach the same conclusion.

favorable to the prosecution to determine whether the evidence was "sufficient to support the conclusion by a reasonable mind that the defendant was guilty beyond a reasonable doubt." *People v. Griego*, 2018 CO 5, ¶ 24. In doing so, we give the prosecution "the benefit of every reasonable inference which might be fairly drawn from the evidence." *People v. Perez*, 2016 CO 12, ¶ 25 (quoting *People v. Gonzales*, 666 P.2d 123, 128 (Colo. 1983)). It is the jury's role to weigh the credibility of witnesses and to resolve conflicting testimony. *People v. Poe*, 2012 COA 166, ¶ 14. We may not substitute our judgment for the jury's or reweigh conflicting evidence or witness credibility. *Id.*

### B. Analysis

#### 1. Attempt to Influence a Public Servant

¶ 67 As relevant to this case, a person commits the crime of attempt to influence a public servant if the person

> attempts to influence any public servant by means of deceit . . . with the intent thereby to alter or affect the public servant's decision, vote, opinion, or action concerning any matter which is to be considered or performed by the public servant or the agency or body of which the public servant is a member.

§ 18-8-306, C.R.S. 2025.  A "[p]ublic servant" is "any officer or employee of government, whether elected or appointed, and any person participating . . . in performing a governmental function," with the exception of witnesses.  § 18-1-901(3)(o), C.R.S. 2025.  A "[g]overnmental function" is "any activity which a public servant is legally authorized to undertake on behalf of government." § 18-1-901(3)(j).

¶ 68　　Peters acknowledges that the prosecution established that Brown sent an email to Romero stating that she, Wood, and Peters would attend the Build.  But Peters contends that there was no evidence *Peters* made any false representation to Romero because she neither sent nor was copied on the email.

¶ 69　　Notably, at trial the prosecution advanced both a direct theory of culpability and a complicity theory.  A person may be found guilty of an offense as a complicitor if they are "legally accountable as principal for the behavior of another constituting a criminal offense if, with the intent to promote or facilitate the commission of the offense, he or she aids, abets, advises, or encourages the other person in planning or committing the offense."  § 18-1-603, C.R.S.

2025. A complicitor need not share the mental state required of the principal; rather, she must act with

> (1) the intent to aid, abet, advise, or encourage the other person in his criminal act or conduct, and (2) an awareness of circumstances attending the act or conduct he seeks to further, including a required mental state, if any, that are necessary for commission of the offense in question.

*People v. Childress*, 2015 CO 65M, ¶ 34. Complicity liability may be established through reasonable inferences based on other established facts and circumstances. *People v. Chavez*, 190 P.3d 760, 769 (Colo. App. 2007).

¶ 70    Peters instigated the scheme that resulted in Brown sending the email to Romero mispresenting that Wood would attend the Build in the capacity of a Mesa County employee. Peters obtained security credentials for Wood by falsely representing to Underwood that Wood was a Mesa County employee who needed computer access. She also made false statements to her staff about Wood being an employee who would attend the Build, which resulted in Brown sending the email to Romero saying as much. In other words, at the very least, Peters intended to aid and encourage others in deceiving Romero.

¶ 71    In any event, the jury could have found Peters directly culpable even if she did not send the email herself. "[T]he statute does not require that the offender commit the deception themself, only that they use some sort of plan or method to deceive the public servant." *People v. Hupke*, 2024 COA 73, ¶ 11 (*cert. granted* Dec. 23, 2024). We view — as we must — the evidence regarding Peters's spearheading of the scheme in the light most favorable to the prosecution, *see Griego*, ¶ 24, and conclude that the evidence was more than sufficient to sustain the conviction as to the attempt to influence Romero. *See Hupke*, ¶ 11.

¶ 72    Peters also contends that the evidence was insufficient on this offense as to Underwood because Peters — not Underwood — made the decision to get Wood access to the computer system. She contends that Underwood admitted that he merely carried out a task and was not the one who made the decision to grant Wood access; thus, she argues, she could not be guilty of attempting to influence Underwood's "decision."

¶ 73    Peters parses Underwood's testimony too much. Peters obtained security credentials for Wood by falsely representing to Underwood that Wood was a Mesa County employee who needed

system access.  And Underwood testified that he would not have given Wood access had he known that Peters had misrepresented that Wood was a Mesa County employee.  Thus, in context, Underwood testified that he decided to carry out the task of giving Wood access to the system based on Peters's misrepresentation.  Thus, the evidence was sufficient to sustain the conviction as to the attempt to influence Underwood.

¶ 74    Finally, Peters contends that the evidence was insufficient to establish that she attempted to influence Casias because he did not testify about any decision, vote, opinion, or action he took during the Build as a result of the misrepresentation about Wood's identity.  But Casias testified that (1) he proceeded with the Build because he thought Wood was a Mesa County employee and (2) he would not have conducted the Build had he known that an "unauthorized" person (a non-Mesa County employee) was present.  Both of these were official actions on Casias's part.  Thus, the evidence was sufficient to sustain the conviction as to the attempt to influence Casias.

## 2. Conspiracy to Commit Criminal Impersonation

¶ 75    A person commits conspiracy to commit criminal impersonation "if, with the intent to promote or facilitate its commission, he agrees with another person or persons that they, or one or more of them, will engage in conduct which constitutes" criminal impersonation, or "he agrees to aid the other person or persons in the planning or commission of" criminal impersonation, and the defendant or co-conspirator performs an overt act to pursue the conspiracy. § 18 2 201(1), C.R.S. 2025. As relevant to Peters's actions, and at the time she committed this offense in May 2021, criminal impersonation occurred when a person knowingly

> [a]ssume[d] a false or fictitious identity or capacity, legal or other, and in such identity or capacity . . . [p]erform[ed] an act that, if done by the person falsely impersonated, might subject such person to an action or special proceeding, civil or criminal, or to liability, charge, forfeiture, or penalty.

§ 18-5-113(1)(b)(I), C.R.S. 2021. Criminal impersonation under this statute was a class 6 felony in May 2021. § 18-5-113(2), C.R.S. 2021. Conspiracy to commit a class 6 felony is also a class 6 felony. § 18-2-206(1), C.R.S. 2025.

40

### a. Recent Statutory Amendment

¶ 76 As a threshold matter, we note that, in her opening brief, Peters sets forth the statute as it currently exists, not as it existed at the time of her offense in May 2021. That year, the General Assembly amended the statute such that the offense remains a class 6 felony if the act of impersonation "subjects [the person falsely impersonated] to an action or special proceeding, civil or criminal, or to liability, charge, forfeiture, or penalty," but the legislature lowered the offense to a class 1 misdemeanor if it only "*might subject*" the person to such risks. Ch. 462, sec. 233, § 18-5-113, 2021 Colo. Sess. Laws 3182-83 (emphasis added). This statutory change, however, was not effective until March 1, 2022, and only applied to offenses committed on or after that date. Sec. 803, 2021 Colo. Sess. Laws at 3331-32.

¶ 77 Thus, the statutory language on which Peters relied in her initial briefing was not the operative language applicable to her case. Compounding Peters's misstatement of the law, the People failed to correct it in their answer brief. Under the party presentation principle, "we rely on the parties to frame the issues for decision" based on "the premise that the parties know what is

41

best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Compos v. People*, 2021 CO 19, ¶ 35 (quoting *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008)).

¶ 78 To this end, in reliance on the parties' apparent agreement regarding the operative statutory language, we spent considerable time at oral argument exploring what appeared to be a significant charging error. Specifically, it appeared that the prosecution had charged Peters with the misdemeanor language — i.e., "might subject" — but treated the charge as a felony. No one at oral argument informed this court of the intervening statutory amendment.

¶ 79 Not until over a week after the oral argument did the People bring to our attention the statutory amendment. We then gave Peters an opportunity to respond to this new information. It is now clear that, notwithstanding the extensive inquiry of the parties during oral argument, Peters was charged using the correct operative language, and the offense was properly identified as a class 6 felony.

¶ 80    Having now received briefing on the proper statutory language, we turn to Peters's challenge to the sufficiency of the evidence to convict her of the charge as it existed in May 2021.

b.    Sufficiency of the Evidence Under the 2021 Statute

¶ 81    Peters challenges the sufficiency of the evidence on this conviction only on the grounds that there was no evidence that Wood might have been subjected to liability if Wood himself had used the Mesa County badge to attend the Build.[7]  We disagree.

¶ 82    Wood was not a Mesa County employee and thus, according to Romero's email, was not "authorized" to attend the Build. Moreover, the evidence showed that Wood was the subject of a criminal investigation as a result of the use of his credentials to access the room where the Build occurred.  This is ample evidence that he might have been subject "to an action or special proceeding, civil or criminal, or to liability, charge, forfeiture, or penalty." § 18-5-113(1)(b)(I), C.R.S. 2021.  Thus, the evidence was sufficient to support the conviction for conspiracy to commit criminal impersonation.

---

[7] Peters does not challenge the sufficiency of the evidence establishing the existence of a conspiracy.

### 3. First Degree Official Misconduct

¶ 83    As relevant here,

> [a] public servant commits first degree official misconduct if, with intent to obtain a benefit for the public servant or another, . . . he or she knowingly:
>
> (a) [c]ommits an act relating to his office but constituting an unauthorized exercise of his official function; or
>
> (b) [r]efrains from performing a duty imposed upon him by law; or
>
> (c) [v]iolates any statute or lawfully adopted rule or regulation relating to his office.

§ 18-8-404(1), C.R.S. 2025.

¶ 84    Peters contends that the evidence was insufficient because there was no evidence that she intended to obtain a benefit for herself or anyone else.  We disagree.

¶ 85    When viewed in the light most favorable to the prosecution, *see Griego*, ¶ 24, the evidence demonstrated that Peters intended to benefit Dr. Frank, his supporters, and herself by providing forensic images of the elections server to nongovernmental actors to substantiate a theory of election fraud.  The evidence was therefore sufficient to sustain this conviction.

44

## IV. Evidentiary Exclusions

¶ 86     Peters asserts that the trial court deprived her of a meaningful opportunity to present a complete defense by excluding various pieces of evidence.  We discern no error.

### A. Additional Background

¶ 87     First, the trial court ruled pretrial that Peters could not introduce evidence that her motive for her actions that led to the criminal charges was to preserve election records pursuant to a statutory duty.[8]  Similarly, the court ruled that she could not offer evidence about the functionality of the voting equipment.  The court opined that such evidence was irrelevant because it did not make any material fact more or less likely.

¶ 88     Consistent with this ruling, the trial court excluded evidence during trial about the alleged reasons for Peters's criminal conduct,

---

[8] Notably, Peters continuously confuses the mens rea of intent with motive.  True, "with intent" or "intentionally" is the mens rea — i.e., the required mental state for criminal culpability, *see, e.g.*, *Copeland v. People*, 2 P.3d 1283, 1286 (Colo. 2000) — for several of Peters's offenses.  And in this context, a person acts "intentionally" or "with intent" when their "conscious objective is to cause the specific result proscribed by the statute."  § 18-1-501(5), C.R.S. 2025.  But whether Peters had the requisite mental state for each charge is a different question than her reasons — i.e., her motive — for committing the offenses.

45

including Peters's (1) alleged belief that Hayes was a governmental informant; (2) statutory duty to preserve election records; (3) purported concerns about the functionality of the elections system; and (4) claimed investigation into the destruction of election records. The court ruled this evidence was irrelevant and would be misleading and confusing to the jury.

¶ 89 The court also ruled that Peters could not argue that she was authorized to use deception to investigate her allegations regarding the elections system functionality and destruction of election records because no such affirmative defense existed and no law permitted her to use deception to investigate purported illegal activity.

¶ 90 Second, Peters sought to admit two audio recordings of the meeting that took place in her office. The first audio recording was made by Stephanie Wenholz, an elections administrator in Mesa County. This recording started when Wenholz entered the meeting and ended when she left. Peters contended that this recording was relevant because the prosecution posited that the conspiracy to provide outsider access to the Build originated at this meeting, yet nothing about this conspiracy was discussed on Wenholz's

46

recording.[9]  A different person made the second audio recording at the meeting, which began an hour after Wenholz left, when issues such as election fraud and canvassing were supposedly discussed.

¶ 91    The court admitted Wenholz's recording but excluded the second.  It found that the second recording was irrelevant and that it contained prejudicial hearsay.  The court further concluded that the rule of completeness, *see* CRE 106, was inapplicable because the Wenholz recording was admitted and the second recording was neither created by Wenholz nor a completion of Wenholz's recording.  *See People v. Montoya*, 2024 CO 20, ¶ 48 ("The purpose of [CRE] 106 is to prevent a party from misleading a jury by excluding portions of a statement that would clarify or explain *the part already received*.") (emphasis added).  Rather, it was simply a recording of a different part of the meeting.

¶ 92    Third, David Stahl, a Dominion customer service representative, testified that, to "combat disinformation," it was important for election administrators to get out facts about how the

---

[9] At trial, Wenholz testified that the conspiracy began at the end of her recording and acknowledged that Peters may have asked people to commit crimes after she left.

47

administrators' election management systems work.  The

prosecution objected to the following two questions: (1) "Which

facts?  Your facts?" and (2) "So, Dominion's position is — that the

system works.  The software is fully compliant with Federal and

State law.  And we don't need any information to the contrary.

True?"  The court sustained the prosecutor's objections to both

queries, ruling that the former was both asked and answered and

argumentative, and the latter sought irrelevant information.

¶ 93     Finally, the court limited Peters's counsel's ability to cross-

examine Romero and Casias regarding a purported Dominion and

SOS election scheme to erase evidence of online manipulation of the

voting machines during elections, finding that the proposed

questioning sought irrelevant information, any probative value of

which was substantially outweighed by the danger of unfair

prejudice.

B.     Standard of Review and Applicable Law

¶ 94     We review a trial court's evidentiary rulings for an abuse of

discretion.  *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002).  A

court abuses its discretion when its ruling is based on a

48

misapplication of the law or is manifestly arbitrary, unreasonable, or unfair. *People v. Vergari*, 2022 COA 95, ¶ 16.

¶ 95    "The right to present a defense . . . is not absolute." *People v. Owens*, 2024 CO 10, ¶ 139. A court is required only to allow the defendant "to introduce all relevant and admissible evidence." *Id.*

¶ 96    Evidence is relevant if it has any "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Relevant evidence is generally admissible. CRE 402. Relevant evidence may be excluded, however, if "its probative value is substantially outweighed by the danger of unfair prejudice." CRE 403. "Because the balance required by CRE 403 favors admission, [we] must afford the evidence the maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected." *Rath*, 44 P.3d at 1043.

## C. Analysis

### 1. Peters's Motive

¶ 97    Peters contends that the trial court erred by excluding evidence related to her statutory duty to preserve election records,

49

*see* 52 U.S.C. § 20701, and her motive to preserve such records and investigate potential election fraud. We disagree.

### a. Duty to Preserve Election Records

¶ 98    The undisputed evidence showed that, before the Build, Brown had already made several backups of the election records. In addition, at Peters's behest, Hayes had created a forensic image of the voting equipment server before the Build. And Peters was not charged for any crimes arising out of either of those acts. In other words, she had fulfilled her duty as Clerk and Recorder to preserve the election records days before the Build.

¶ 99    Thus, Peters's statutory duty to retain and preserve election records and her actions fulfilling that duty had no bearing on whether she engaged in the illegal conduct for which she was charged. Accordingly, the trial court did not abuse its discretion by prohibiting Peters from introducing evidence regarding her motive to retain the election records.

### b. Duty to Investigate Election Fraud

¶ 100   Peters's claim that she should have been permitted to offer evidence regarding her investigation of election fraud is equally meritless.[10]

¶ 101   As noted, 52 U.S.C. § 20701 imposes a duty on election officials like Peters to "retain and preserve" election records for twenty-two months.  When construing a statute, we look "to the language of the statute, giving its words and phrases their plain and ordinary meanings," and must read those words and phrases "according to the rules of grammar and common usage."  *McCoy v. People*, 2019 CO 44, ¶ 37.  Doing so, we conclude that the words "retain" and "preserve" do not encompass the term "investigate."  "Retain" means "to keep in possession or use."  Merriam-Webster

---

[10] We specifically reject Peters's challenge to the exclusion of three expert reports she claims confirm unlawful features of the voting system because she fails to identify — and we cannot ascertain — where the record reflects any effort to admit this evidence at trial or where the trial court purportedly ruled the evidence inadmissible. *See People v. Graybeal*, 155 P.3d 614, 620 (Colo. App. 2007) ("This court 'will not search through briefs to discover what errors are relied on, and then search through the record for supporting evidence.'" (quoting *Mauldin v. Lowery*, 255 P.2d 976, 977 (Colo. 1953))).  Rather, she merely cites exhibits attached to her response to a motion to quash a subpoena, in which she did not ask the court to admit the expert reports.

Dictionary, https://perma.cc/GQH2-R32N. "Preserve" means "to keep safe from injury, harm, or destruction." Merriam-Webster Dictionary, https://perma.cc/9S9B-FAF8.

¶ 102 Looking further at the statutory scheme, 52 U.S.C. § 20702 provides the punishment for when a person "willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved." The statute says nothing about neglecting to investigate such destruction. Had Congress intended to impose a duty on the officer of election (as opposed to law enforcement officers) to also investigate destruction of election records, it could have said so. *See Howard v. People*, 2020 CO 15, ¶ 26 ("If that was the legislature's intent, then it would have said so."). It didn't.

¶ 103 Simply put, by their plain language, neither § 20701 nor § 20702 imposes any duty on the election official to investigate the destruction of such records. Consequently, evidence related to Peters's claim that she was motivated by this duty was irrelevant.

¶ 104 To the extent Peters, relying on section 18-1-701, C.R.S. 2025, asserts that investigating the destruction of election records was

related to her statutory affirmative defense of execution of a public duty, we disagree.

¶ 105    Section 18-1-701 provides, as relevant here, that "conduct which would otherwise constitute an offense is justifiable and not criminal when it is required or authorized by . . . [l]aws defining duties and functions of public servants." § 18-1-701(1)-(2)(a).

¶ 106    Relatedly, the cases on which Peters relies to support her contention that she could use deception to uncover an illegal act cannot bear the weight she places on them.  For example, the cases she cites involving entrapment, *United States v. Russell*, 411 U.S. 423, 436 (1973), and *Sorrells v. United States*, 287 U.S. 435, 441-42 (1932), are inapposite because she is not a law enforcement officer, nor does she assert that she was engaging in this deception to lay a trap for others to walk into.  And the cases holding that a law enforcement officer is permitted to engage in deception as a law enforcement investigation technique, *People v. Morley*, 725 P.2d 510, 515 (Colo. 1986), and *Baucom v. Martin,* 677 F.2d 1346, 1347

(11th Cir. 1982), are equally inapplicable because, again, Peters is not a law enforcement officer.[11]

¶ 107 Peters also can find no harbor in the cases that she cites involving private citizens going undercover to ferret out housing discrimination or trademark violations. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982); *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 119, 122 (S.D.N.Y. 1999). Neither of these cases involved a criminal prosecution or an allegation that the private citizens involved deceived or otherwise attempted to influence a public servant.

¶ 108 In sum, because the evidence Peters sought to admit had no relevance, the court did not abuse its discretion by excluding it.

---

[11] Peters also relies on *Morones-Quinones v. Holder*, 591 F. App'x 660, 660 (10th Cir. 2014), for the proposition that the benefit a criminal impersonation perpetrator seeks to gain by deceit under section 18-5-113(1)(e), C.R.S. 2010 (amended 2011; subsequent version at section 18-5-113(1)(b)(II), C.R.S. 2021), must be unlawful. This case is inapplicable because Peters was not convicted under this subsection of the criminal impersonation statute for her conspiracy to commit criminal impersonation charge. As noted, she was charged under section 18-5-113(1)(b)(I), C.R.S. 2021.

## 2. Biased Prosecution Witnesses

¶ 109 Peters contends that the trial court improperly excluded evidence about a scheme she alleged existed between Dominion and the SOS to install new voting software, which would erase evidence that the voting machines were purportedly connecting to the internet and being manipulated during elections while votes were being tabulated. Peters contends that this limitation on her cross-examination of Romero and Casias violated her Sixth Amendment right to confrontation. We disagree because, for reasons already discussed, this evidence goes only to Peters's motive for her actions and was thus irrelevant to her charges. Therefore, the trial court did not abuse its discretion by limiting Peters's cross-examination on this issue. *See People v. Jaramillo*, 183 P.3d 665, 670 (Colo. App. 2008) (concluding that limiting cross-examination to relevant evidence was not an abuse of discretion).[12]

---

[12] Nor does Peters advance any argument as to why it was erroneous for the trial court to quash a subpoena to Dominion's vice president. She merely notes it happened. So we do not address it. *See People v. Gingles*, 2014 COA 163, ¶ 29.

## V. Affirmative Defenses

¶ 110 Next, Peters contends that the trial court erred by denying her request to instruct the jury on the affirmative defenses of Supremacy Clause immunity and execution of a public duty. We discern no error.

### A. Supremacy Clause Immunity

¶ 111 We have already concluded that, as a matter of law, Peters was not immune from prosecution under the Supremacy Clause. Because she was not entitled to claim immunity, the trial court could not have erred by not instructing the jury on the defense.

### B. Execution of a Public Duty

¶ 112 We also reject Peters's contention that the trial court erred by denying her request to instruct the jury on the statutory affirmative defense of execution of a public duty. *See* § 18-1-701.

¶ 113 Peters again relies on 52 U.S.C. § 20701, which she asserts "expressly required election officials like Ms. Peters to preserve election records." However, we have previously concluded that the trial court correctly determined that Peters had already discharged that duty and, thus, her actions were not taken in pursuit of that duty. In other words, there was no evidence that any of Peters's

56

actions underlying the charges against her were related to her duty to preserve the records that were already preserved. Thus, Peters cannot show that she was entitled to a jury instruction on this affirmative defense because, as a matter of law, it was not available to her.[13]

## VI. Notice of the Charges Against Peters

¶ 114 Peters next contends that the trial court erred by denying her motion to dismiss the indictment because it failed to give her notice of the charges with respect to the three counts of attempting to influence a public servant. She argues that each count failed to identify the "decision, vote, opinion, or action" that Peters was trying to influence. We again discern no error.

¶ 115 "We review the sufficiency of a charge in an information de novo." *People v. Perez-Hernandez*, 2013 COA 160, ¶ 30.

¶ 116 A charging document must provide the defendant with notice of the charges that is sufficient to permit the preparation of an

---

[13] When the trial court ruled that her duty to preserve had been discharged, her trial counsel expressly disavowed any reliance on making an image of the records and, instead, argued that her charged conduct was pursuant to her duty to investigate. Because we have found that she did not have such a duty, she was not entitled to the affirmative defense instruction on this ground either.

adequate defense, and it must protect the defendant from further prosecution for the same offense. *People v. Russell*, 36 P.3d 92, 95 (Colo. App. 2001); *see* Crim. P. 7(b)(2); *see also Esquivel-Castillo v. People*, 2016 CO 7, ¶ 10 ("[T]he modern trend of testing the sufficiency of an information [is] based on the fundamental objectives it is meant to serve, rather than according to any technical pleading requirements of the common law."). If the charging document identifies the essential elements of the crime charged in the language of the statute, it is legally sufficient. *See People v. Melillo*, 25 P.3d 769, 778 (Colo. 2001).

¶ 117　Contrary to Peters's assertion, there is no requirement that the charging instrument identify the particular decision, vote, opinion, or action that Peters was trying to influence. Peters cites no case, and we are aware of none, that says otherwise. But even if there was such a requirement, the charging document here gave more than sufficient detail, as it laid out the core findings of the investigation. Specifically, the charging document described Underwood's creation of security credentials for Wood, as well as Romero's and Casias's decisions to allow the Build to proceed.

Thus, we conclude that the charging document provided Peters with more than sufficient notice of the charges. *See id.*; § 18-8-306.

## VII. "Security Breach" Comments

¶ 118  Peters contends that the prosecutor violated her due process rights by misleading the jury into believing that she caused a "security breach" because her phone contained photographs of passwords that later appeared online, without telling jurors that the passwords were redacted and useless.[14]

¶ 119  We first note that Peters asks us to take judicial notice that the redacted passwords do not appear on the website the witness referenced. She also relies on purported news articles that were published after the trial. Because these documents are not in the appellate record, we cannot consider them. *See Fendley v. People*, 107 P.3d 1122, 1125 (Colo. App. 2004) ("We are limited to the record presented . . . ."). (In any event, whether that website *currently* contains material it is alleged to have contained *in the past*

---

[14] The People characterize this argument as a prosecutorial misconduct argument. But that is not the posture of Peters's argument. We address her claim in the posture she presents it, rather than the People's recasting of it. That being said, the same defects in Peters's due process claim would also doom this issue as a prosecutorial misconduct claim.

is irrelevant.  Nor is it a proper area for judicial notice, as it is not "a fact [that is] not subject to reasonable dispute."  CRE 201.)

¶ 120    Peters argues that the leak of the passwords cannot accurately be called a security breach because the passwords were redacted and additional authentication credentials were needed to obtain access to any secure or nonpublic information.  Again, the appellate record does not support those assertions.  In any event, Peters conflates a security breach with a system breach.  In other words, the mere fact that multiple authentication credentials are needed to access a system does not mean that unauthorized disclosure of one of those credentials is not a security breach.

¶ 121    Moreover, the prosecutor's discussion of the release of the passwords was, in context, wholly appropriate.  The discovery of this leak is what led to the investigation that ultimately resulted in Peters being charged in this case.  The references to a security breach, therefore, were fair comments on the evidence in the case.

¶ 122    Because the prosecutor's references to a security breach were a reasonable description related to the leak of the passwords, which itself was helpful information to the jury, we discern no error.[15]

### VIII. Failure to Hold a Hearing Regarding Purported Improper Juror Conduct

¶ 123    Peters contends that the trial court erred by denying her request for a post-trial hearing to determine if a juror's bias affected the verdict.  Again, we disagree.

¶ 124    According to the exhibit attached to Peters's post-trial motion, a juror told a defense investigator that the telephone line to her business was cut during trial, costing her business $4,000.  The juror mentioned that initially she was concerned that it was related to her jury service but ultimately did not say who she thought was responsible.

¶ 125    "CRE 606(b) is a broad ban against the solicitation and use of juror testimony, affidavits, or statements addressing the validity of

---

[15] Peters contends, in conclusory fashion, that this evidence violated the court's pretrial order excluding CRE 404(b) evidence and makes a passing reference to a comment by the prosecution comparing the release of the passwords to "Apollo 13."  Of course, as the trial court properly informed the jury, a prosecutor's statements are not evidence.  In any event, these are undeveloped arguments that we decline to consider.  *See Gingles*, ¶ 29.

a jury verdict." *Stewart v. Rice*, 47 P.3d 316, 320 (Colo. 2002). CRE 606(b) provides three exceptions: (1) improper exposure to extraneous prejudicial information; (2) improper outside influence on any juror; and (3) mistakes concerning the verdict form.

¶ 126 Whether an exception to CRE 606(b) applies is a legal question we review de novo. *Cf. Clark v. People*, 2024 CO 55, ¶ 65.

¶ 127 The trial court properly determined that CRE 606(b) precluded a hearing. In her post-trial motion, Peters did not assert that any CRE 606(b) exception applied, and her argument that a hearing was required was based solely on speculation that the juror believed she was being targeted by someone associated with Peters. She similarly identifies no applicable CRE 606(b) exception to support her conclusory assertion that the juror was "biased," instead relying on inapplicable cases about jurors lying during voir dire. Thus, Peters has failed to demonstrate any error regarding the trial court's handling of this issue.

## IX. Prosecutorial Misconduct

¶ 128 Next, Peters contends that the prosecutor committed misconduct during rebuttal closing argument. Specifically, she contends that the prosecutor misstated the evidence when she said,

> Let's talk about the beginning of this scheme.
> April 23rd Dr. Frank says to the Defendant,
> wouldn't it be a feather in your cap to reveal all
> this fraud?  And she's like, you know what?
> I'm gonna go out on a limb.  Let me invite you
> into the [Build].  And he's like, whoa, whoa,
> whoa.  *That would be illegal but I have the best*
> *guy in the country.*

(Emphasis added.)  Because her defense was based, in part, on her claim that she did not know letting an outsider into the Build would be illegal, she contends that this misstatement warrants reversal. We disagree.

¶ 129    We engage in a two-step analysis when reviewing claims of prosecutorial misconduct.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  First, we determine whether the conduct was improper based on the totality of the circumstances.  *Id.*  In doing so, we evaluate claims of improper argument in the context of the argument as a whole and in light of the evidence before the jury. *People v. Conyac*, 2014 COA 8M, ¶ 132.  Next, if we identify any misconduct, we consider whether it warrants reversal under the applicable standard.  *Wend*, 235 P.3d at 1096.

¶ 130    A prosecutor may not intentionally misstate the evidence. *Martinez v. People*, 244 P.3d 135, 141 (Colo. 2010).  However,

"because arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful." *People v. Samson*, 2012 COA 167, ¶ 30.

¶ 131    We note that trial counsel did not object to the prosecutor's statement.  Consequently, we will reverse only if any error was plain, meaning that it was both obvious and substantial.  *Hagos v. People*, 2012 CO 63, ¶ 14.  An error is obvious if the act or omission challenged on appeal contravened a clear statutory command, a well-settled legal principle, or Colorado case law.  *Scott v. People*, 2017 CO 16, ¶ 16.  And an error is substantial if it "so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction."  *Id.* at ¶ 15.

¶ 132    We cannot say that the asserted error is plain.  Contrary to Peters's implication, we are not persuaded that this fleeting comment is what convinced the jury that Peters knew her behavior was unlawful.  Quite the contrary, the evidence of Peters's knowledge in this regard is legion: She excluded her employees from the meeting once the discussion turned to this; she ordered her employee to turn off the cameras in the room where the voting

machines were and turn them back on after the Build; she set Wood up as a middle man, securing false credentials for him and then surreptitiously having Hayes use those credentials; and she affirmatively misstated to Romero and Casias that "Wood" (actually Hayes) was a Mesa County employee. The evidence of her knowledge of the illegality of her conduct is so overwhelming, we simply cannot say that the prosecutor's statement (even if improper) had any impact on the verdict, let alone an impact so great as to cause serious doubt about the reliability of the judgment of conviction.

## X. Classification of Conspiracy to Commit Criminal Impersonation

¶ 133    Peters next contends that her conviction for conspiracy to commit criminal impersonation was incorrectly entered as — and she was incorrectly sentenced for — a felony, while the offense on which the jury was instructed, and of which it found her guilty, was a misdemeanor. She therefore contends that her felony conviction cannot stand.

¶ 134    As noted above, this argument relies on statutory language that did not yet exist at the time of Peters's offense. *See supra* Part

III.B.2.a.  The indictment set forth the charge in the language of the statute as it existed at the time of her offense, and the jury was instructed with that language.  At the time she committed the offense, it was a class 6 felony.

¶ 135  In response to the post-oral-argument briefing on this point, Peters argues that she is entitled to the benefit of the ameliorative legislation.  This once again misstates the law.  Where the General Assembly expressly gives amendatory legislation only prospective effect, those amendments, even if ameliorative, do not benefit a defendant who committed the offense before the operative date in the legislation.  *People v. Stellabotte*, 2018 CO 66, ¶ 29.

¶ 136  The statute was not mischaracterized in the charging document or the mittimus.  Entry of a conviction for a class 6 felony was, therefore, proper.

## XI.  Sentencing

¶ 137  Finally, Peters contends that the trial court erred during sentencing because it (1) considered only factors favorable to the prosecution; (2) violated her free speech rights; (3) violated her Eighth Amendment rights; and (4) improperly considered her

contempt conviction.  Because we agree with the second contention, we need not address the other three.

## A.    Standard of Review

¶ 138    We review a trial court's imposition of a sentence within the statutory range for an abuse of discretion because the trial court's "familiarity with the facts of the case" places it "in the best position to fix a sentence that reflects a balance of the relevant considerations." *People v. Vigil*, 718 P.2d 496, 507 (Colo. 1986).

¶ 139    "However, we review constitutional challenges to sentencing determinations de novo." *People v. Jaso*, 2014 COA 131, ¶ 8.

## B.    Analysis

¶ 140    Peters contends that the trial court violated her First Amendment right under the United States Constitution and her right under article II, section 10 of the Colorado Constitution because it punished her based on her protected speech regarding allegations of election fraud.  We agree.

¶ 141    During sentencing the court said,

> There are many things in my mind that are crystal clear about this case.  You are no hero.  You abused your position and you're a charlatan who used and is still using your prior position in office to [peddle] a snake oil

67

> that's been proven to be junk time and time again.  In your world, it's all about you.

The court later said,

> So the damage that is caused and continue[s] to be caused is just as bad, if not worse, than the physical violence that this court sees on an all too regular basis.  And it's particularly damaging when those words come from someone who holds a position of influence like you.  Every effort to undermine the integrity of our elections and public's trust in our institutions has been made by you.  You've done it from that lectern.  The voting public provided you with everything you've done has been done to retain control influence [sic].  The damage is immeasurable.  And every time it gets refuted, every time it's shown to be false, just another [tale] is weaved.

¶ 142   As the People note, Peters did not object during sentencing to the trial court's statements.  Accordingly, we will reverse only if any error was plain.  *Hagos*, ¶ 14.

¶ 143   It is well settled that the First Amendment generally prohibits punishing someone for their protected speech.  "[A] court may not punish an individual by imposing a heavier sentence for the exercise of [F]irst [A]mendment rights. . . .  A sentence based to any degree on activity or beliefs protected by the [F]irst [A]mendment is constitutionally invalid."  *United States v. Lemon,* 723 F.2d 922,

68

937-38 (D.C. Cir. 1983). In *Delaware v. Dawson,* 503 U.S. 159, 165 (1992), for example, the United States Supreme Court held that, while "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment," a sentencing court goes too far if it considers such speech or association that is not relevant to the sentencing.

¶ 144    Courts have affirmed sentences premised on speech or associational activity when it was relevant to the sentencing decision. *See, e.g.*, *United States v. Stewart,* 686 F.3d 156, 170 (2d Cir. 2012) (explaining that the defendant's public statements were relevant sentencing considerations because they demonstrated her lack of remorse and belief that her previous sentence was not serious); *United States v. Simkanin,* 420 F.3d 397, 419 (5th Cir. 2005) (noting the district court's finding that the defendant's "membership in a group with radical views rejecting the laws of the United States and . . . professed beliefs that he is not required to abide by the tax laws would lead him to commit other tax-related crimes"); *People v. Tresco,* 2019 COA 61, ¶ 28 ("[W]e conclude that

69

evidence of gang affiliation is not per se inadmissible during sentencing if it is related to the nature of the offense and the defendant's character, not merely his abstract beliefs."); *State v. Warfield*, 34 P.3d 37, 40 (Idaho Ct. App. 2001) (holding that, in imposing sentence, the trial court properly considered the defendant's statement that he spared the victim's life only because she was white and explaining that the defendant's "racist belief system was relevant in assessing the danger he present[ed] to society, a factor that is unquestionably legitimate for consideration by a sentencing court"); *State v. Schreiber*, 2002 WI App 75, ¶ 17 (concluding that the trial court did not err by considering the defendant's poetry in imposing sentence because the poems reflected the defendant's violation of his parole condition that he refrain from gang activity).

¶ 145 In Colorado, sentencing courts are to consider "the nature of the offense, the character and rehabilitative potential of the offender, the development of respect for the law and the deterrence of crime, and the protection of the public." *People v. Leske*, 957 P.2d 1030, 1043 (Colo. 1998) (quoting *People v. Fuller*, 791 P.2d 702, 708 (Colo. 1990)); *see also* § 18-1-102.5, C.R.S. 2025

(enumerating the purposes of the Colorado Criminal Code with respect to sentencing). Here, the trial court's comments about Peters's belief in the existence of 2020 election fraud went beyond relevant considerations for her sentencing. Her offense was not her belief, however misguided the trial court deemed it to be, in the existence of such election fraud; it was her deceitful actions in her attempt to gather evidence of such fraud. Indeed, under these circumstances, just as her purported beliefs underlying her motive for her actions were not relevant to her defense, the trial court should not have considered those beliefs relevant when imposing sentence.

¶ 146    To be sure, many of the trial court's statements indicated wholly appropriate considerations. The court's view that Peters was motivated by self-promotion and self-interest, for example, was fully within the court's discretion to articulate and consider, as was her evident lack of remorse.[16]  But several specific statements can be

---

[16] We recognize that when a defendant chooses to remain silent and invokes their constitutional right against self-incrimination at trial and sentencing, "a trial court cannot constitutionally consider [their] lack of an expression of remorse as an aggravating circumstance." *People v. Young*, 987 P.2d 889, 894 (Colo. App.

read only as the infliction of punishment because of Peters's beliefs and statements about election fraud. For example, the court noted that her "words" were particularly damaging because of the position of influence she held; and it noted that every time her beliefs were refuted, she would make a new claim.

¶ 147 Thus, notwithstanding the fact that some of the trial court's considerations were tied to proper sentencing considerations, when the court's comments are viewed in their totality, it is apparent that the court imposed the lengthy sentence it did because Peters continued to espouse the views that led her to commit these crimes. The tenor of the court's comments makes clear that it felt the sentence length was necessary, at least in part, to prevent her from continuing to espouse views the court deemed "damaging."

---

1999). Although Peters did not testify at trial, she chose to make a statement at her sentencing hearing. Thus, it was not inappropriate for the court to consider at sentencing whether Peters's statements evidenced a lack of remorse. *See, e.g., People v. Everett*, 250 P.3d 649, 664 (Colo. App. 2010) ("[A] defendant who testifies at trial or at the sentencing hearing waives his or her constitutional right to remain silent, and a court can consider what he or she says, or does not say, for purposes of sentencing, including whether the defendant has expressed remorse.").

72

¶ 148 But the court failed to acknowledge that Peters is no longer the Mesa County Clerk and Recorder. She is no longer in a position to engage in the conduct that led to her conviction. So it cannot be said that the lengthy prison sentence was for specific deterrence. To the contrary, the sentence punished Peters for her persistence in espousing her beliefs regarding the integrity of the 2020 election.

¶ 149 For these reasons, we conclude that the trial court obviously erred by imposing sentence at least partially based on Peters's protected speech. *See Lemon*, 723 F.2d at 937-38; *see also Dawson*, 503 U.S. at 167 (concluding that the defendant's "First Amendment rights were violated by the admission of . . . Aryan Brotherhood evidence . . . because the evidence proved nothing more than [the defendant's] abstract beliefs"); *Stewart*, 686 F.3d at 169 ("It is impermissible to sentence a defendant more harshly based on associations that do not relate to specific criminal wrongdoing, for example, or for beliefs that some might find morally reprehensible, or for critical statements made in public because they were made in public.").

¶ 150    And, of course, the court's improper consideration of Peters's protected speech to impose a longer prison sentence necessarily means the error was substantial.

¶ 151    Thus, we must remand the matter for resentencing.[17]   In doing so, we reject Peters's conclusory and undeveloped request to require that the case be assigned to a different district court judge.  *See People v. Gingles*, 2014 COA 163, ¶ 29.  Any such request must first be pursued in the district court.  *See Crown Life Ins. Co. v. Haag Ltd. P'ship*, 929 P.2d 42, 45 (Colo. App. 1996) (declining to address on appeal issues not presented for consideration by the trial court).

## XII.   Disposition

¶ 152    The judgment of conviction is affirmed in part and reversed in part.  The convictions are affirmed, the sentence is reversed, and the case is remanded with directions.

JUDGE WELLING and JUDGE LIPINSKY concur.

---

[17] We express no opinion as to whether, on remand, the trial court may take into account the statutory amendment to the crime of criminal impersonation when determining the length of sentence for the conspiracy to commit that felony.  *See Wells-Yates v. People*, 2019 CO 90M, ¶ 48 ("Consideration of the statutory changes as the most valid indicia of Colorado's evolving standards of decency is not equivalent to the retroactive application of those changes.").